**Terry Anthony CHAYRA, Plaintiff,**

v.

**The UNITED STATES, Defendant.**

**No. 497–89C.**

United States Claims Court.

May 17, 1991.

Prescott L. Prince, Richmond, Va., for plaintiff.

James M. Kinsella, Washington, D.C., with whom was Asst. Atty. Gen. Stuart M. Gerson, for defendant. Captain Robert C. Barber, Office of the Judge Advocate General, of counsel.

## OPINION

NETTESHEIM, Judge.

This case is before the court after argument on cross-motions for summary judgment. Plaintiff's major argument is whether a decision of a military correction board denying an application for disability benefits should be overturned because he was denied a misconduct hearing prior to the determination that his disability was not service-related. Defendant moved separately to dismiss the complaint for lack of jurisdiction. The case was suspended on September 14, 1990, when it became apparent that defendant had lodged the same jurisdictional arguments in several appeals, including *Sawyer v. United States, appeal docketed,* No. 90–5101 (Fed.Cir. May 2, 1990). The Federal Circuit rejected defendant's argument against jurisdiction in *Sawyer v. United States,* 930 F.2d 1577 (Fed.Cir.1991), *rev'g on other grounds* 18 Cl.Ct. 860 (1989). The mandate in *Sawyer* issued on May 14, 1991, so this case may be decided on the merits.

## FACTS

The following facts derive from the administrative record. Terry Anthony Chayra ("plaintiff"), a Second Lieutenant in the United States Marine Corps Reserve (the "Marines"), entered active duty on August

22, 1982. On May 23, 1983, while a student Naval Aviator stationed at the Naval Air Station in Pensacola, Florida, plaintiff visited a Pensacola "beach bar." Plaintiff met Richard S. Chapman, a civilian, at a bar where they remained for an unspecified amount of time before moving out onto the beach. While in the bar and on the beach, plaintiff consumed alcoholic beverages—roughly one six-pack of beer and one-third pint of scotch whiskey. Following plaintiff's suggestion, Chapman joined plaintiff in his 1983 BMW for a drive to Fort Walton Beach, Florida. On the way, plaintiff's car entered a curve while traveling well in excess of the posted speed limit, left the roadway, and struck a sand dune, thereby ejecting plaintiff through the windshield. The car became airborne, rolled over several times, and eventually came to rest 462 feet from the point where it left the roadway. Prior to the accident, plaintiff's car was exceeding 80 miles per hour, the highest speed indicated on the car's speedometer.

At the time of the accident, the road was clear and dry, and plaintiff's vision was unobscured. The approach to the curve itself contained numerous motorist warning signals, including two flashing overhead alert lights, a "reduce-speed-ahead" sign, a series of seven rumble strips in the pavement, a "35–miles–per–hour" speed limit sign, and a sign indicating the existence and direction of the curve. A Florida Highway Patrolman investigating the accident listed driving while intoxicated and exceeding the safe speed limit as the contributing causes of the accident.

While still comatose, plaintiff was transported to the Baptist Hospital of Pensacola, where he underwent emergency surgery for severe head injuries. A blood test administered at the hospital showed plaintiff to possess a blood alcohol level of 249 milligrams per deciliter, or .249 percent. The lab slip purporting to show plaintiff's blood level had the number "3143435" written on it, but plaintiff's name did not appear on the slip. However, three other Baptist Hospital documents include, simultaneously, the above number and plaintiff's name. One date written on the blood test

form is illegible—the "Date Done" slot reads either "6/23" or "5/23", the latter being the date of admission into the hospital, but the form is marked with a check in the box labeled "stat." On June 16, 1983, plaintiff received a transfer to the Naval Hospital in Bethesda, Maryland.

According to Congress' statutory scheme governing a servicemember's entitlement to severance or retirement pay,

> [e]ach member of the armed forces who incurs a physical disability that, in the determination of the Secretary concerned, makes him unfit to perform the duties of his office, grade, rank, or rating, and that resulted from his intentional misconduct or willful neglect or was incurred during a period of unauthorized absence, shall be separated from his armed force without entitlement to any benefits under this chapter.

10 U.S.C. § 1207 (1988).

Four days after the accident, on May 27, 1983, the Department of the Navy (the "Navy") opened an investigation into the cause of plaintiff's mishap. Marine Captain Lenn M. Lanahan, plaintiff's superior officer, was assigned to perform the following: conduct an informal Judge Advocate General ("JAG") Manual investigation of the accident; make findings and opinions as to both the cause of the accident and plaintiff's disability status; and submit a report of those findings and opinions. On June 28, 1983, Capt. Lanahan issued his report which included the following findings of fact: that plaintiff was driving his car at the time of the accident; Mr. Chapman was a passenger at the time; the two men each consumed alcohol while in the bar and on the beach; numerous warning signs marked the approach to the curve and the curve itself; and plaintiff's car was travelling in excess of 80 miles per hour as it entered the curve. Additionally, Capt. Lanahan determined that plaintiff's car left the roadway, flipped over several times and landed on top of plaintiff, who had been forced through the windshield.

The report also contained a summary of an interview with Mr. Chapman. During

the interview Mr. Chapman stated that he twice questioned the speed at which plaintiff was driving, but that plaintiff failed to respond to either inquiry. Plaintiff's comatose condition rendered him unable to participate in the investigation. Capt. Lanahan concluded that plaintiff's excessive intoxication was the proximate cause of the accident. The report further concluded that the severity of plaintiff's injuries was proportional to the vehicle's excessive speed and that the accident resulted from plaintiff's own misconduct and did not arise in the line of duty. Capt. Lanahan recommended that no disciplinary action be taken against plaintiff, and that a finding of "not in line of duty" and "due to the member's own misconduct" be made concerning plaintiff's injuries.

Section 0815 of the JAG Manual provides that a "not-in-line-of-duty" misconduct finding cannot be entered against a servicemember unless provided with a section 0815 hearing held at the request of the convening authority. The hearing's formalities require that the servicemember be advised that questions regarding his injury have arisen, with no requirement that he give information concerning the origin of his injury, but that he be provided with a full opportunity to present any relevant information to explain or refute any allegations on rebuttal. The regulations further imply that if the servicemember is unable to participate in such a hearing, as was the case with plaintiff, any line-of-duty misconduct finding should be postponed. No misconduct hearing was held in plaintiff's case.

On June 20, 1983, after transfer to Bethesda Naval Hospital, a medical board convened to consider plaintiff's medical condition. The Board concluded that plaintiff was medically unfit for duty and recommended referral of the case to the Central Physical Evaluation Board (the "CPEB") for consideration. In the meantime, a mental competency board determined that plaintiff was not mentally competent to handle his own affairs.[1]

On July 1, 1983, the Commanding Officer of Training Squadron Six concurred with Capt. Lanahan's report (first endorsement). Commander J.P. Smith, Training Air Wing Five, made a finding on July 19, 1983, that any potential line-of-duty misconduct determination was improper because no section 0815 hearing was held (second endorsement).

On September 9, 1983, the Chief of Naval Education and Training (the "CNET"), the officer exercising court-martial jurisdiction over plaintiff, forwarded the investigation to the Commanding Officer, Bethesda Naval Hospital (third endorsement). Since plaintiff was now conscious, the CNET requested a section 0815 misconduct hearing for plaintiff. In a reply endorsement dated September 16, 1983, the Commanding Officer of Bethesda Naval Hospital responded to the request for a hearing by stating that no hearing could be held at that time because, although plaintiff was conscious, he was not mentally competent (fourth endorsement). On September 28, 1983, since no misconduct hearing could be convened, the CNET disapproved Capt. Lanahan's findings that plaintiff's injuries did not occur in the line of duty and were the result of his own misconduct (fifth endorsement). The remaining findings of fact, opinions, and recommendations in the report, however, received the CNET's approval. These endorsements disapproving Capt. Lanahan's recommendations were not included in the copies of the report reviewed by the two physical evaluation boards.

On July 27, 1983, after considering all the relevant records, the CPEB recommended classifying plaintiff as unfit for duty. The CPEB reasoned that plaintiff's injuries resulted from his own misconduct and, hence, warranted separation from the military without disability benefits. Because plaintiff was incompetent at the time of the determination, the CPEB forwarded its findings, in accordance with the Disability Evaluation Manual 1982 (the "DEM")

---

1. When a servicemember allegedly possesses a medical condition which might impair his or her judgment, a medical board shall convene to determine the individual's mental competence to manage his or her affairs. Disability Evaluation Manual 1982 § 0205.

§§ 0205, 0206a to the Regional Physical Evaluation Board (the "RPEB") at Bethesda Naval Hospital. On that same day, Marilyn J. Chayra, plaintiff's mother and appointed legal representative, rejected the CPEB's findings and demanded a formal hearing before the RPEB pursuant to DEM § 206d.

Under DEM § 0202a(3), which sets forth disability evaluation procedures, any injury suffered by a Navy member is presumed to be the result of causes other than the member's misconduct. To overcome this presumption, clear and convincing evidence is required. Further, the DEM mandates that if a member's injury results from his own misconduct, it is not in the line of duty. Misconduct is separated into two distinct categories: intentional misconduct and willful neglect. The definition of misconduct found at section 0202a(1)(a), b(1) encompasses any injury proximately caused by prior and specific voluntary intoxication, but only if

(a) it can be clearly shown that the member's physical or mental faculties were impaired;

(b) the extent of impairment can be clearly determined; and

(c) it is clear that such impairment was the proximate cause of injury.[2]

On September 28, 1983, the RPEB conducted a hearing at which both civilian and military counsel represented plaintiff. After an opportunity for *voir dire,* plaintiff's counsel made no objections to the board's membership. During the hearing, counsel for plaintiff introduced documents, called Mrs. Chayra as a witness, and contested the accuracy of plaintiff's alleged intoxication level.

After deliberations the RPEB found plaintiff unfit for further military service. The RPEB stated that while uncontroverted evidence existed that plaintiff had been drinking, such evidence was non-conclusive as to the degree of impairment. Relying on Mr. Chapman's statement, the Board went on to conclude:

There is clear and convincing evidence and testimony from disinterested individuals that the member was travelling at excessive speed for the existing conditions. In view of numerous highway warning devices, and in view of Mr. Chapman's testimony that he twice warned the member about his speed, the Board was of the opinion that the member was incapable of safe driving by reason of alcohol intoxication or by reason of gross negligence or both to a degree constituting misconduct.

Hence, the RPEB unanimously recommended plaintiff's separation from the Marines without disability benefits.

Plaintiff's counsel filed a statement in rebuttal to the RPEB's findings with the Physical Review Council (the "PRC"), alleging, *inter alia,* that the endorsements to the JAG Manual investigation, which disapproved Capt. Lanahan's recommending a finding of misconduct and which had not been before the CPEB or RPEB, constituted new evidence. On December 7, 1983, after considering the rebuttal, the PRC concurred with the RPEB's findings and approved plaintiff's discharge without disability benefits.

On January 4, 1984, the Judge Advocate General (the "JAG") reviewed the disability proceedings and found them legally unobjectionable. The JAG determined that although section 0815 requires a hearing, "[i]f the member is unable to participate in such a hearing, as was the case here, then any line-of-duty/misconduct finding must be postponed (and indeed in some cases, may never be made)." Further, the JAG stated that the DEM misconduct findings are independent of the JAG Manual investigation and relate solely to 10 U.S.C. § 1207. Section 1207 provides that "each member who incurs a physical disability that ... resulted from his intentional misconduct ... shall be separated from his armed force without entitlement to any benefits under this chapter." The JAG also concluded that notice to a member or

2. The process by which it is determined whether a member is entitled to severance pay is explained in *Sawyer,* 18 Cl.Ct. at 861–65.

his appointed representative was not mandatory under section 0815. In the JAG's view, the evidence regarding causation and proximate cause was "substantial, clear, and convincing as to both speed and intoxication," plaintiff received a full and fair DEM hearing, and the JAG Manual investigation followed proper procedures. The JAG forwarded this memorandum to the Assistant Secretary of the Navy and requested that "in order to remove any possible prejudice to ... [plaintiff] resulting from any possible irregularity in the proceedings below, you should conduct a *de novo* review of the facts in this case and make your decision accordingly."

On March 1, 1984, before plaintiff's discharge from the Marines, his counsel submitted a petition for relief from final action to the Secretary of the Navy pursuant to DEM § 0214 alleging, *inter alia*, "misconduct" in the JAG proceedings. Plaintiff complained that the JAG improperly considered new evidence and that plaintiff did not have the benefit of a full and fair hearing.

The Naval Physical Disability Review Board (the "NPDRB") deemed plaintiff's petition for relief lacking in merit and recommended that the PRC's decision be implemented. Specifically, the NPDRB found no legal error in the disability evaluation system's assessment of the JAG Manual investigation and concluded that "it was clear and convincing" that plaintiff's disability resulted from his own misconduct. This decision, along with plaintiff's petition for relief, was forwarded to the Assistant Secretary of the Navy (Manpower & Reserve Affairs) on April 20, 1984.

On May 10, 1984, plaintiff's counsel submitted an addendum to the petition for relief with the Secretary of the Navy. In the addendum, plaintiff stated that the president of the RPEB, Colonel William Clark, committed suicide only six weeks after hearing plaintiff's case. Further, plaintiff stated that Col. Clark was an alcoholic, a manic depressive, and was likely of unsound mind when he presided over and issued the decision in plaintiff's case. Plaintiff argued that these conditions eliminated the possibility that he received a full and fair hearing before Col. Clark.

On March 19, 1985, after the *de novo* review of the entire record, the Assistant Secretary affirmed the holdings of all lower boards and requested that the Director of the Naval Council of Personnel Boards take action necessary to separate plaintiff from the Marines. No evidentiary hearing was held in this *de novo* proceeding. Plaintiff received his discharge without disability benefits on May 24, 1985.

On July 15, 1985, plaintiff submitted an application to the Board for Correction of Naval Records (the "BCNR") in an attempt to change his records to indicate retirement by reason of physical disability. Specifically, plaintiff alleged error in the JAG's memorandum to the Assistant Secretary, the Assistant Secretary's *de novo* review, and his discharge without a medical examination.

The BCNR received an advisory opinion from the Naval Counsel of Personnel Boards (the "NCPB"), as well as a concurring opinion by the NPDRB. Plaintiff submitted his rebuttal to all matters of record, as well as his personal affidavit, in which he denied being drunk at the time of the accident and averred that Mr. Chapman's movements distracted him and caused the accident. The BCNR asked for an advisory opinion from the JAG regarding several disputed matters.

In a responsive memorandum dated December 9, 1986, the JAG considered each of plaintiff's allegations of error and concluded that they lacked merit.[3] The JAG spe-

---

3. The JAG's advisory opinion advanced other conclusions. No rehearing or new hearing was intended or required by law or regulation prior to the Secretary's final decision; the Assistant Secretary could consider the Judge Advocate General's memorandum of December 24, 1984, and the April 19, 1984 NPDRB advisory opinion in his decision to deny relief, even though neither of these documents had been shown to plaintiff's counsel because there is no requirement that advisory opinions be furnished to petitioner or his counsel or that they be given an opportunity to rebut such advisory opinions; it was not prejudicial to discharge plaintiff without a physical examination since article 15–56(1) of the manual for medical evaluations

cifically concluded that only an administrative *de novo* review by the Assistant Secretary of facts as documented in the record was necessary. Therefore, no error existed because the review was only of matters already in the record. Plaintiff filed a rebuttal on February 17, 1987.

On March 23, 1987, after a review of all relevant evidence and documents, the BCNR "found that the evidence submitted was insufficient to establish probable material error or an injustice." Further, the BCNR "substantially concurred" with the advisory opinions. Plaintiff filed suit in this court on September 23, 1989.

## DISCUSSION

■ 1. The reviewing court cannot overturn a determination made by the military with respect to disability retirement, absent a violation of a statute or regulation, *Curry v. United States*, 221 Ct.Cl. 741, 746, 609 F.2d 980, 983 (1979), unless plaintiff shows "'by cogent and clearly convincing evidence,'" that such a determination is arbitrary, capricious, or unsupported by substantial evidence. *Finn v. United States*, 212 Ct.Cl. 353, 356, 548 F.2d 340, 342 (1977) (quoting *Stephens v. United States*, 174 Ct.Cl. 365, 371–72, 358 F.2d 951, 954 (1966)). "Judicial deference to administrative decisions of fitness for duty of service members is and of right should be the norm...." *Maier v. Orr*, 754 F.2d 973, 984 (Fed.Cir.1985). The Federal Circuit in *Maier* relied on *Heisig v. United States*, 719 F.2d 1153, 1156 (Fed.Cir.1983):

> It is equally settled that responsibility for determining who is fit or unfit to serve in the armed services is not a judicial province; and that courts cannot substitute their judgment for that of the military departments when reasonable minds could reach differing conclusions on the same evidence....

(Footnotes omitted.)

■ In military pay matters, the court reviews a plaintiff's case "through the prism of a correction board." *Cohn v. United States*, 15 Cl.Ct. 778, 789 (1988). The court's review is limited. In order to overturn the Board's decision the plaintiff must show by cogent and clearly convincing evidence, *Finn*, 212 Ct.Cl. at 356, 548 F.2d at 342, (1) a material legal error or injustice in the correction board proceeding and (2) an adequate nexus between the error or injustice and his separation from service without disability compensation. *Hary v. United States*, 223 Ct.Cl. 10, 15, 618 F.2d 704, 706 (1980). Further, plaintiff must overcome the presumption that "administrators of the military, like other public officers, discharge their duties correctly, lawfully, and in good faith." *Sanders v. United States*, 219 Ct.Cl. 285, 302, 594 F.2d 804, 813 (1979). While the court might disagree with the board's decision, it cannot substitute its own judgment for the board's if reasonable minds could reach differing resolutions of a disputed fact.

■ 2. Plaintiff argues that an administrative hearing was an absolute requirement under section 0815 of the JAG Manual. Since a section 0815 misconduct hearing was not held due to plaintiff's inability to participate in the investigation, plaintiff asserts a denial of his rights. Plaintiff's principal complaint is that he did not receive an opportunity to present his version of the events and to test the credibility of those witnesses whose testimony formed the basis of the misconduct determination. Plaintiff further asserts that the BCNR erred in using the JAG Manual investigating officer's conclusions regarding misconduct in determining whether or not he merited disability benefits.

Section 0815 provides, in pertinent part:
0815 MISCONDUCT AND LINE OF DUTY HEARINGS
 a. *Action by convening authority.* In each case in which a member of the naval service has incurred an injury or contracted a disease and the circumstances are such that investigation by a

---

provides that a member who has been evaluated by a medical board incident to separation from active duty need not undergo further physical examination at the time of separation; and

plaintiff was provided a full and fair hearing and the evidence was substantial, clear, and convincing as to both speed and intoxication.

fact-finding body was required and conducted under sections 0810a or 0814a, the convening authority of the fact-finding body, unless he returns the record or report for further inquiry, shall take on the following actions:

. . . .

(3) If the member was not designated a party before the fact-finding body, or if having been so designated, he was not fully accorded his rights as such, and if, upon review of the record or report of the fact-finding body the convening (or higher) authority has substantial doubt that the injury or disease of the member was incurred in line of duty, *he shall afford the member a hearing or shall forward the record or report to the command to which the member is attached so that a hearing may be afforded. The hearing in such case shall include the following elemental requirements:*

(a) The member shall be advised that questions have arisen concerning the circumstances under which he incurred an injury or disease and that line of duty and misconduct determinations must be made;

(b) If the member is suspected of having committed an offense, he shall be so advised as required by Article 31(b) UCMJ;

(c) The member shall be advised that he has the right not to give information regarding the origin, incurrence, or aggravation of an injury or disease that the member may have. See section 0306.

(d) Any statement, record, or other evidentiary matter considered by the convening authority shall be made available for inspection by the member;

(e) The member shall be given full opportunity to present any relevant matter in refutation, explanation, rebuttal, or otherwise respecting the incurrence of the injury or disease. A reasonable period of time shall be provided to the member for this purpose.

(f) The member shall be provided a Privacy Act statement in accordance with section 0308 and Appendix A–3–a. A format to document the hearing is contained in Appendix A–8–g and h.

(Emphasis added.) As referenced in section 0815a, section 0814a states in part:

0814 HOW FINDINGS ARE TO BE RECORDED IN INJURY CASES

a. *JAG Manual investigations.* A fact-finding body (either formal or informal) must be convened and the commanding officer must make findings concerning misconduct and line of duty in any case in which:

(1) The injury was incurred under circumstances which suggest that a finding of "misconduct" might result;

(2) The injury was incurred under circumstances which suggest that a finding of "not in line of duty" might result;

(3) There is a reasonable chance of permanent disability being involved and the commanding officer considers that the appointment of a fact-finding body is the appropriate means by which to ensure that an adequate official record is made concerning the circumstances surrounding the incident; . . .

Plaintiff argues that the plain meaning of these two sections, when read together, set forth the requirement of a section 0815 hearing when either misconduct or activity not in line of duty is plausible. Consequently, plaintiff contends that he was denied his right to procedural due process. *See Renicker v. United States,* 17 Cl.Ct. 611, 617 (1989) (amount of process that is "due" varies with the circumstances). Section 0815 also provides that a line-of-duty misconduct finding cannot be entered against a servicemember unless he is given a section 0815 hearing. Plaintiff reasons that if the member is unable to participate in such a hearing, then any line-of-duty misconduct finding must be postponed.

Defendant agrees that section 0815 is the procedural safeguard for cases wherein an informal investigation reveals apparent misconduct, in that it precludes any adverse conclusion so long as the member remains incompetent. Defendant main-

tains, however, that the JAG Manual investigation fully complied with the provisions of section 0815. Defendant reasons:

> While that section does not prohibit the investigating officer from rendering an opinion as to the injured member's misconduct, it does bar higher authorities from making a *final conclusion*, upon the completion of all review of the investigation, that misconduct had occurred, absent a hearing in which the service member is given an opportunity to participate. As the Judge Advocate General's 1984 comment states, such an adverse conclusion is precluded as long as the member remains incompetent, and none was made here.

Def's Br. filed Jan. 12, 1990, at 16 (emphasis in original).

Defendant points out that an attempt was made to provide plaintiff with a hearing. Once it was determined, however, that plaintiff was incapable physically of participating in the investigation, the CNET, acting as the officer exercising general court-martial jurisdiction in accordance with section 0815b, disapproved in the fifth endorsement that portion of the investigating officer's report regarding plaintiff's misconduct. Because no adverse conclusion was made regarding plaintiff's line-of-duty or misconduct status, defendant contends the requirements of section 0815 were fulfilled. After a review of the record, this court agrees with defendant and finds no procedural irregularity in the Navy's failure to provide a hearing given plaintiff's incapacity. *Cf. Renicker*, 17 Cl.Ct. at 616 ("It is clear that no formal hearing during the line-of-duty investigation is required by Army regulations.").

It also should be pointed out that section 0815 is not a prerequisite to a misconduct determination in the disability evaluation system. Although reviewing authorities are required to consider section 0815 proceedings, section 0815(b) provides, in pertinent part:

> Reviewing authorities subsequent to the officer exercising general court-martial jurisdiction need neither comment nor record approval or disapproval of the pri-

or actions concerning line of duty and misconduct.

3. Plaintiff asserts, however, that even though Capt. Lanahan's line-of-duty misconduct determination did not receive approval, subsequent reviewing authorities accepted copies of Capt. Lanahan's report, but did not consider copies of the later endorsements that disapproved Capt. Lanahan's findings. Consequently, plaintiff argues, the BCNR abused its discretion by not rejecting the findings of the lower boards, since these boards substantially based their findings on misleading information contained in the JAG Manual investigation.

It is plaintiff's position that the information considered by the boards was misleading because subsequent endorsements to the investigating officer's report were not before either the CPEB or RPEB, as required by DEM § 0706. DEM § 0706c states, in pertinent part:

> Line of duty/misconduct reports. In each of its evaluations in which a line of duty/misconduct determination is required ... but is not included in case documentation, the Central Physical Evaluation Board shall take timely action to secure a copy together with *available* endorsements. This will include a speedletter request to the command assigned responsibility for the investigation with a copy to the command in the chain of command exercising general court-martial authority. If no reply to the speedletter is received within 15 days, a message will be sent to the command exercising general court-martial authority requesting assistance in securing the investigation report.

(Emphasis added.) Based on this provision of the DEM, plaintiff contends that the CPEB and the RPEB were misled into relying on the unacceptable opinions of the investigating officer, which should have been qualified by the later endorsements.

The JAG advisory opinion deemed the endorsements not, as plaintiff argues, tantamount to an admission that the earlier misconduct opinions were factually insupportable. Rather, these endorsements

amounted to an acknowledgement that the member was unable to participate in a section 0815 hearing. Defendant argues that not only were the endorsements purely procedural in nature, but that their exclusion resulted because they were unavailable at the time, and DEM section 0706(c) calls only for available endorsements.

The date of the CPEB recommendation is July 27, 1983; the RPEB issued its report on September 28, 1983. The first and second endorsements, dated July 1 and July 19, 1983, respectively, noted that a line-of-duty misconduct determination could not be made as a section 0815 hearing had not been performed. These endorsements were available to the CPEB and the RPEB, whose decisions issued on July 27, 1983, and September 28, 1983, respectively. The third endorsement on September 9, 1983, through the fifth on September 28, 1983, were not available to the medical boards. The fifth endorsement is most crucial to plaintiff in that it disapproves Capt. Lanahan's report and recommendation. However, the regulation requires only the production of readily available endorsements. As the fifth endorsement issued on September 28, 1983, the date of the RPEB report, substantial evidence supports the finding that it was not available.

Defendant also argues that no harm resulted from failure to include the endorsements since both the CPEB and RPEB are required to make independent determinations of a servicemember's eligibility. The BCNR concurred in the view of the JAG:

[M]isconduct findings within the Disability Evaluation System are independent and for that very reason, Disability Boards tend to be interested only in the evidence portions—not the opinions and recommendations—of the JAG Manual report. To suggest that the Regional Physical Evaluation Board was prejudiced or influenced by either the JAG Manual report, or the findings of the Central Board, is to misunderstand the Regional Board's function—it is the administrative equivalent of a trial de novo. Counsel's 'poisoning of the stream' theory necessitates a dubious assumption—that the Regional Board was hesitant

about exercising its own discretion and authority....

The President of the Naval Physical Disability Review Board was of the same view in his letter of April 19, 1984: "[D]isability evaluation determinations are separate from misconduct line-of-duty findings as made in endorsements to the LODI [Line of Duty Investigations]." JAG Manual 0801d states:

*Disability retirement and severance pay.* In order for members of the naval service who sustain permanent disabilities while on active duty to be eligible to receive certain retirement or severance pay benefits, the requirements of the applicable statutes must be met. One of these requirements is that the disability must not result from the member's '... intentional misconduct or willful neglect ...' and must not have been '... incurred during a period of unauthorized absence.' 10 U.S.C. §§ 1201, 1203, 1204, 1206, and 1207. Physical evaluation determinations are made independently and are not controlled by misconduct line-of-duty findings or conclusions recorded under the provisions of this manual. They are instead controlled by regulations contained in the Disability Evaluation Manual (SECNAVINST 1850.4.). As a practical matter, such determinations for physical review purposes must rest upon the evidence available. Generally this will be those facts which have been officially recorded and are on file within the Department of the Navy. This would include reports and investigations submitted in accordance with the provisions of this Manual.

*See McCray v. United States,* 3 Cl.Ct. 253, 257 (1983) (discussing section 0801d).

This argument has surface appeal, but is not dispositive. The more substantial position, with which the court agrees, is that the record supports a finding that all available endorsements were forwarded, as required by DEM § 0706.

■ 4. The court has reviewed the record before the BCNR and finds no basis to disturb its decision that clear and con-

vincing evidence shows that plaintiff's injuries were due to his own misconduct. Among plaintiff's challenges to the decision on the merits is the assertion that the lab slip purporting to show his blood alcohol level as .249 percent was not credible evidence, since the date is illegible and only the number "3143435" and not his name appears on the slip. Concerning the illegibility of the date, the court agrees with the rationale of the NPDRB. Although the date can be read as either 5/23 or 6/23, plaintiff was admitted on 5/23 and released before 6/23, so the date could only be an administrative error. Furthermore, had the testing been delayed for such a length of time, the likely result would have shown no blood alcohol reading. Plaintiff also contends that the slip does not positively identify the blood tested as his. If this slip were read in isolation, plaintiff would be correct in that only the number 3143435 appears on the slip. As the NPDRB advisory and plaintiff's own medical records demonstrate, however, the same identification number was also used on other reports on which plaintiff's name appears. Consequently, the BCNR acted reasonably in finding that the number on the lab slip corresponded to plaintiff.

Another challenge involves Col. Clark. The senior member of the RPEB, Col. Clark, committed suicide approximately six weeks after the RPEB hearing. Because Col. Clark previously was diagnosed as suffering from manic depression and alcoholism, plaintiff contends that the findings of the RPEB are void due to Col. Clark's mental unfitness. The JAG uncovered no evidence that Col. Clark "was anything but attentive, fair, and impartial in his handling of Lieutenant Chayra's case." Plaintiff's

counsel asked no questions during *voir dire* concerning any member's physical or mental fitness. Plaintiff's failure to comment on or challenge Col. Clark during the hearing provides further indication that Col. Clark's conduct did not demonstrate an inability to perform his duties. Finally, though unanimity is not mandatory in the decisions of the RPEB, the findings in plaintiff's case in fact rendered were without dissent. On this record the BCNR reasonably could reject plaintiff's contentions and find that Col. Clark's subsequent suicide did not impugn the impartiality of the RPEB hearing.

### CONCLUSION

Defendant's motion for summary judgment is granted, and plaintiff's cross-motion is denied.[4] The Clerk of the Court shall dismiss the complaint. No costs.

IT IS SO ORDERED.

---

4. All of plaintiff's arguments not addressed specifically in this opinion have been considered carefully and found to be without merit. The JAG opinion, relied on by the BCNR, deals fully with these points.

This court holds that the Navy did not violate any of its regulations in determining whether plaintiff's disability was service related and also holds that the BCNR's decision on the merits was supported by substantial evidence. The Federal Circuit's recent opinion in *Sawyer* involved a remarkably similar case on the facts in which this court found such a violation. The Federal Circuit ruled that a correction board, if

petitioned both to consider alleged violations of regulations governing disability determinations and to review the record on the merits, will be upheld if the board's decision in reviewing the record is supported by substantial evidence. Plaintiff in this case also requested that the BCNR review his case on the merits, specifically challenging that clear and convincing evidence supported the medical boards' findings. Therefore, consonant with the *Sawyer* appellate decision, this court could have foregone ruling on plaintiff's arguments concerning alleged violations of Navy regulations.