Ann M. **CHILDERS**, M.D., Plaintiff,

v.

**UNITED STATES**, Defendant.

No. 06–496C.

United States Court of Federal Claims.

April 30, 2008.

Eugene R. Fidell, Feldesman Tucker Leifer Fidell, LLP, Washington, D.C., for plaintiff.

Robert E. Chandler, Trial Attorney; Jeanne E. Davidson, Director; Bryant G. Snee, Deputy Director, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., for defendant. Of counsel, Captain Jason Osbourne, United States Air Force.

## OPINION

HORN, Judge.

### FINDINGS OF FACT

Dr. Ann Childers entered the Air Force as a Reserve officer in 1989 during her first year of medical school. After graduating from medical school in 1992, she began active duty on June 12, 1992. She left the Air Force on June 30, 2000, upon completion of her active duty service commitment. From 1992 to 1995, she interned for one year and completed two years of general psychiatry residency training at Wright–Patterson Air Force Base in Ohio. During these three years of training, her annual evaluations praised her scholarly performance and military conduct. She was found to "meet the highest standards of the United States Air Force."

Following her residency training, from 1995 to 1997, Dr. Childers commenced a two-year child and adolescent psychiatry fellowship at the Tripler Army Medical Center in Hawaii. As with her previous evaluations, her fellowship evaluations at Tripler praised her performance and her proficiency ratings were excellent to outstanding. During her second fellowship year, which was less structured and required more time management and organizational skills, her evaluator, Colonel Bernard Lee, made the observation that Dr. Childers had difficulty initially, but that after obtaining help, she "demonstrated the level of efficiency commensurate with her level of training." Toward the end of her second year of fellowship training, in 1997, Dr. Childers was diagnosed with Attention Deficit Hyperactivity Disorder (ADHD).

Dr. Childers completed her fellowship as a Distinguished Graduate in June, 1997.[1] In a

final evaluation of Dr. Childers' fellowship, dated September 9, 1997, Colonel Paul D. Copp, Dean of Civilian Institution Programs, offered favorable remarks such as, "Excellent diagnostic acumen—intelligently considers all available information and uses sound judgment in the selection and sequence of studies to arrive at an accurate diagnosis," "Adept at planning, implementing and evaluating therapy," "Outstanding performance on clinical rotations," "Extensive knowledge of medicine," and "Demonstrated high levels of competency on the in-service examination." He concluded that "Captain Childers has clearly excelled in every respect. She will return the Air Force's significant investment in her training many times over."

After completing her fellowship, in July 1997, Dr. Childers was stationed in Germany at the Kapaun Air Station and began practicing as a child and adolescent psychiatrist at the Pediatric Behavioral Medicine Clinic, 86th Medical Operations Squadron. Dr. Childers claims that she was approved for overseas duty without regard for her ADHD diagnosis and that the Air Force failed to accommodate her ADHD disability. Shortly after her arrival, questions arose regarding her clinical abilities.

According to documents in the record, it appears that in April, 1998 complaints were raised regarding Dr. Childers' performance after a peer review found her charts to be substandard. Major David Kutz, M.D., Consultant to the United States Air Force in Europe (USAFE) Command Surgeon for Child and Adolescent Psychiatry, reviewed Dr. Childers' clinical practice in a report dated June 18, 1998. Although Major Kutz found deficiencies in the plaintiff's charting, which she was working to address, Major Kutz found Dr. Childers' practice not to be sufficiently deficient to recommend changes to the status of her clinical privileges. According to a later report by Lieutenant Colonel Stephen Cozza, M.D., discussed more fully below, Major Kutz "strongly recommend[ed] that she [Dr. Childers] receive clinical supervision to address the deficiencies

1. Dr. Childers successfully passed Part I of the American Board of Psychiatry and Neurology board certification. According to the record before the court, while in the military, Dr. Childers did not sit for Part II, which would have certified her to practice general psychiatry.

with her charting and interpersonal aspects of her practice." A formal monitoring and evaluation plan was recommended, but was not fully implemented.

Dr. Childers' Officer Performance Report (OPR) for the period July 1, 1997 to June 30, 1998, her first as a practicing clinician, indicated that she met all of the professional standards. Her rater, Major Leslie Paulie, Clinical Psychologist, described Dr. Childers as a "Computer guru," "Aggressive advocate," "Standout educator; avidly seeks opportunities to teach technicians, peers, patients, and family members," "Model of active community involvement," and "Staunch patient advocate." Major Paulie also stated that Dr. Childers "Applied consistent effort over time to improve organizational skills necessary for independent function." An additional rater, Lieutenant Colonel Linda Griffith, Behavioral and Developmental Services Flight Commander, commented that Dr. Childers' "Willingness to serve as a child psychiatry consultant to Aviano AB, Italy, and Lajes Field, Azores, saved thousands of air evacuation dollars; precluded unnecessary and costly sponsor reassignments." Lieutenant Colonel Griffith concluded that Dr. Childers was a "Stellar patient advocate who requires ongoing supervision to direct her zeal and develop her officership." Reviewer Brigadier General Michael Wooley, Commander of the 86th Airlift Wing, signed his concurrence, without making additional comments.

On August 1, 1998, Lieutenant Colonel Robert Williamson, Chief of Medical Staff, wrote a memorandum titled "Consideration of Abeyance of Privileges of Maj Ann Childers."[2] Lieutenant Colonel Williamson cited Major Kutz's June 18, 1998 review that had found Dr. Childers' clinical practice to be within the standards. He recommended not putting Dr. Childers' privileges in abeyance despite the "difficulties with her behavior," but recommended that Colonel Thomas Townsend, M.D., the Commander of the 86th Medical Operations Squadron, pursue the "command-directed mental health evaluation as planned" of Dr. Childers at Lakenheath, England. Lieutenant Colonel Williamson continued, "I believe this is indicated, based on the unusual behavior that has been recently documented by Maj Pauley. This will also give us the information that will be needed to perform a medical board evaluation." According to Dr. Cozza's memorandum, discussed below, the results of the command-directed psychiatric evaluation supported Dr. Childers' previous diagnosis of ADHD, but a Medical Examination Board (MEB) was not convened. Clinical depression was not documented, however, concerns about future performance were raised. Following the evaluation, Dr. Childers was moved from the Kapaun Pediatric Behavioral Medicine Clinic to the Ramstein Clinic in Germany to be closer to colleagues and to allow for peer support and consultation.

Dr. Childers received another OPR covering her second year as a practicing clinician from July 1, 1998 to June 30, 1999. The OPR indicated that Dr. Childers met all of the performance standards.[3] The first rater, Lieutenant Colonel James Rundell, Primary Care Teams Flight Commander, commented that Dr. Childers used an "Exceptionally thorough evaluation processes," played a "Critical role in caring for most difficult child psychiatry cases—no other such resource in medical group," and always went "the extra mile" to ensure each patient and family received all available care. As in Dr. Childers' previous OPR, Dr. Childers' weak organizational skills were raised. Lieutenant Colonel Rundell made the observation, "Difficulties meeting administrative requirements improved with mentoring and additional supervision time." The second rater, Colonel Townsend, Commander of the 86th Medical Operations Squadron, praised Dr. Childers and noted that Dr. Childers "significantly improved time and workload management skills" with mentoring. The third rater, Brigadier General Wooley, concurred without making additional comments, similar to what he had done on the earlier OPR.

---

2. He copied Colonel Casey, Colonel Townsend, Lieutenant Colonel Budinger, and Lieutenant Colonel Rundell.

3. Two of the three raters who participated in the second OPR were different than for the previous OPR, covering July 1, 1997 to June 30, 1998.

On October 11, 1999, while she was on call, Dr. Childers was summoned to report to the Landstuhl Regional Medical Center emergency room to evaluate a seriously suicidal patient. According to Dr. Childers, she asked the psychiatric ward nurse who contacted her to reach another physician because she had severe stomach pain and was ill with gastritis/GERD [Gastroesophageal Reflux Disease]. Another physician attended and handled the emergency. Because of Dr. Childers' lack of response to the emergency call and other concerns about her clinical performance, on October 13, 1999, her supervisor placed her credentials in abeyance. The Credentialing Committee, as a whole, then suspended Dr. Childers' privileges on November 5, 1999. According to Dr. Childers, after October 1999, until her active duty terminated by reason of the expiration of her active service commitment on June 30, 2000, Dr. Childers was not allowed to perform her official military duties as a child and adolescent psychiatrist, her physical training exercises, nor her medical training.

On December 11, 1999, Dr. Cozza, M.D.,[4] Program Director, Child and Adolescent Psychiatry Service at the Walter Reed Army Medical Center, submitted a 14–page memorandum to the Credentials Committee titled "Review of Clinical Practice for Major Ann Childers." In his report, Dr. Cozza listed eight individuals, in addition to Dr. Childers, with whom he had met as part of his review. In addition, he indicated he had reviewed documents, including memoranda, e-mails, clinical charts, and other documents provided to him.

Dr. Cozza reported that certain clinicians perceived Dr. Childers to overuse particular diagnoses such as ADHD, Learning Disabilities and Central Auditory Processing, while not identifying other important psychiatric conditions. Additionally, Dr. Childers was "viewed as inappropriately referring children and parents to the school system for services, demonstrating too great a reliance on psychoeducational testing." Dr. Cozza also added that non-physician colleagues felt that Dr. Childers was unresponsive to their collaboration needs on Pediatric Behavioral Medicine Clinic cases and that "her style of interpersonal interaction was felt to alienate multidisciplinary colleagues in her clinic and other community agencies, as well as the parents of children under her care." Dr. Cozza mentioned other concerns, particularly with respect to Dr. Childers' promptness to administrative and professional responsibilities. For example, "She has been counseled repeatedly in matters such as not pursuing completion of her specialty board examinations, allowing BCLS [basic cardiac life support] to lapse, allowing credentials to lapse, allowing her car insurance to lapse and missing multiple other military obligations." He stated in the report that colleagues and supervisors were concerned that Dr. Childers "may have been suffering from a clinical depression during the period from summer 1998 through the spring 1999."

In the "Results" section, Dr. Cozza identified multiple areas of problematic performance which indicated that Dr. Childers was "not able to function effectively and independently as a child and adolescent psychiatrist," and indicated "impairment in her clinical judgment and decision-making processes." In particular, Dr. Cozza identified six areas of concern: (1) inadequate data gathering; (2) idiosyncratic clinical formulation; (3) compromised ability to effectively collaborate with colleagues; (4) inappropriate boundaries with patient parents; (5) lack of focus in the role of child psychiatrist; and (6) poorly formulated and executed therapeutic plans. He recommended an "extensive neuropsychiatric assessment for any disorders that may be impacting on Maj Childers' ability to function effectively as a child and adolescent psychiatrist." He also indicated that "[i]f a disorder is identified, and found to be impairing, then Maj Childers' [sic] should be referred for Medical Evaluation Board proceeding or administrative separation from the Air Force, whichever is appropriate."

Dr. Cozza concluded that Dr. Childers' privileges should remain restricted, but not

---

4. According to Dr. Childers, Lieutenant Colonel Rundell hand-picked Dr. Cozza to review her records, and since Dr. Cozza was not available for several weeks, her privileges were suspended in anticipation of the expiration of the maximum, allowable, privilege abeyance period.

revoked, and that she should participate in organized remediation and retraining under the supervision of a competent child and adolescent psychiatrist. Dr. Cozza continued: "Demonstration of ability to practice independently in a clinically competent fashion and within the standard of care for a period of at least one year should be the grounds for reinstatement of clinical privileges." On January 12, 2000, the Credentials Committee recommended restricting Dr. Childers' privileges to include 100% supervision, which was implemented on January 13, 2000. According to Dr. Childers, on January 21, 2000, the Commander notified her of his intent to limit her clinical privileges. On February 24, 2000, according to Dr. Childers, she requested a hearing and was notified that one would be conducted.

Captain Andrew Reynolds, M.D., Dr. Childers' Health Care Provider in the Air Force, requested a Radiology Examination Report at Landstuhl to evaluate Dr. Childers for early evidence of osteoporosis and to establish a baseline bone density. It is unclear from the administrative record what prompted the exam, which took place on February 15, 2000. The report includes the following statement: "Reasons for Order: [Patient] is a 45 yo [year-old] perimenopausal active duty female with sig [significant] family h/o [history of] osteoporosis who is also at risk based on body habitus." The report concluded that Dr. Childers was "OSTEOPOROTIC, BASED ON T–SCORE."

From April 25 through 28, 2000, a hearing on Dr. Childers was convened at the Ramstein Air Base to address the following issues: (1) "deficiencies in data gathering"; (2) "deficiencies in clinical formulation"; (3) "deficiencies in treatment plan formulation/execution"; (4) "deficiencies in effective collaboration with colleagues"; (5) "difficulties responding constructively to supervision." The Hearing Committee also considered Dr. Childers' (6) "lack of focus in her role as a child psychiatrist" and (7) "difficulties in maintaining appropriate boundaries with patient's parents." The Hearing Com-

mittee sustained the allegations except for allegations (6) and (7).[5] The Hearing Committee recommended restriction of Dr. Childers' privileges to include 100% supervision for a period of at least one year and that Dr. Childers should complete a two-year program in child and adolescent psychiatry.

Due to her upcoming term of service expiration at the end of June 2000, Dr. Childers received a form, dated May 9, 2000, "SUBJECT: Medical Examination for Voluntary Separation/Retirement." The form stated:

1. Air Force policy mandates a medical examination (physical) per AFI [Air Force Instruction] 48–123 before separation or retirement when certain conditions exist. The medical facility will determine whether an examination is mandatory or optional.

2. A termination examination by the Environmental Health Unit (is) (is not) required based on data (see AFMAN 36–2622) in the Personnel Data System (PDS) and on previous exposure to occupational duties.

3. For those instances when a physical examination is not mandatory, it may be administered upon your request. Indicate in first indorsement to this letter whether or not you want a physical examination if medical personnel determine it is optional. NOTE: THIS LETTER MUST BE RETURNED WITHIN 10 DAYS OF RECEIPT.

(emphasis in original).

On the same day, Dr. Childers replied on the form that she desired a medical examination in conjunction with her scheduled separation. The form was addressed to the "Director, Base Medical Service" stating that Dr. Childers was scheduled for voluntary separation on June 30, 2000 and that she requested a medical examination before her separation. The Director responded:

The medical records of Ann Childers were reviewed according to AFI 48–

5. According to Dr. Childers, the Hearing Committee consisted of a flight surgeon from Ramstein Air Base, an internist from Landstuhl Regional Medical Center, and a non-board-certified child and adolescent psychiatrist.

123,[6] and it has been determined that a physical examination for separation or retirement (is not required) (is required) and/or an occupational health examination (is not required) (is required). Appointment is: 16 May @ 0840. . . .

Although the date for the appointment was included, the options were not circled on the form. Dr. Childers' name and the appointment date were hand written on the form. The administrative record does not contain information regarding a "16 May @ 0840" appointment, or whether one actually occurred on that date.

On May 22, 2000, Dr. Childers' Profile Officer, Dr. Todd Abbott, an Air Force Captain and flight surgeon, prepared a medical profile for Dr. Childers and signed off on AF Form 422, "PHYSICAL PROFILE SERIAL REPORT." The parties have stipulated that, before seeing Dr. Abbott, Dr. Childers' medical profile stated she had a profile of P–3 which indicated physical condition(s) amounting to a significant defect(s) or disease(s) that were under good control and did not limit her duty. According to Dr. Childers, Dr. Abbott "did a complete work-up." He temporarily revised her profile to P–4–T to indicate "Organic defect(s), systemic and infectious disease(s). . . ." AFI 48–123, vol. 4, att. 4, June 5, 2006. However, on the same form, signed by Dr. Abbott, consistent with her previous profile, the profile for "Upper Extremities," "Lower Extremities," "Hearing (Ears)," "Vision (Eyes)" and "Psychiatric" were all marked with number "1," indicating either free of disease or normal. *See* AFI 48–123, vol. 4, att. 4, ¶¶ U, L, H, E, S. In the remarks section, Dr. Abbott diagnosed Dr. Childers with "MARFAN HYPERMOBILITY SYNDROME WITH OSTEOPOROSIS AND DILATED AORTIC ROOT." Dr. Abbott indicated that Dr. Childers was not qualified for World Wide Service. On the form "MEDICAL DEFECT/CONDITION REQUIRED MEB OR PEB PROCESSING. ASSIGNMENT AVAILABILITY CODE (AAC) 37 APPLIES" was checked. Another section with the caption "*As shown by examination or review of Health Record or current course of treatment, individual is*

cleared *for*[:] OVERSEAS ASSIGNMENT; REMOTE/ISOLATED TOUR; RETIREMENT/SEPARATION WITHIN (1) YEAR; OTHER (*Specify*)," Dr. Abbott specified "LIMITED DUTY" in the section titled "OTHER" and none of these boxes was checked or had notations. In the section "INDIVIDUAL DEFECTS/RESTRICTIONS," Dr. Abbott wrote "NO DEPLOYMENTS, PT [physical training] AT OWN PACE, AND NO HEAVY LIFTING." The form also states that the examination was initiated by Captain Andrew Reynolds, M.D., Air Force Internal Medicine at Landstuhl Regional Medical Center, Germany, as the Health Care Provider, but his signature was not included on the form. (emphasis in original).

Following Dr. Abbott's diagnosis, Dr. Childers was referred to Johns Hopkins Hospital in Maryland. On June 12, 2000, Dr. Hal Dietz, Professor of Pediatrics, Medicine, Molecular Biology, and Genetics at Johns Hopkins University examined Dr. Childers and diagnosed her with Ehlers–Danlos Syndrome ("EDS"). EDS carries a risk of an enlarged aorta, but Dr. Dietz indicated that Dr. Childers' aorta was not enlarged at that time. He advised Dr. Childers to avoid isometric activities that involved muscle straining and contact and competitive sports, but he encouraged her to remain active with low intensity aerobic activities. Dr. Dietz noted his evaluation on Dr. Childers' Aeromedical Evacuation Patient Record, AF Form 3899, which he signed. In the Aeromedical Evacuation Patient Record, in paragraph 17, titled "DIAGNOSIS," a hand written entry indicated that Dr. Childers suffered from "Ehlers Danlos Syndrome Type II or III, Aortic prominence (abnormality), Osteoporosis, Disphagia" Under paragraph 20i, titled "MEDICATIONS/TREATMENTS", Dr. Dietz wrote "Exercise restrictions, No contact activities, No competitive activities, No isometric exercise; F/U [follow up] evaluation including Echo in approx. 9 months." In the next paragraph, "BRIEF NARRATIVE," Dr. Dietz wrote, "45 yo [female with] chronic back pain, joint hypermobility, orthostatic vascular instability, dysphagia. DX–Ehlers

---

6. *See* Air Force Instruction (AFI) 48–123, Medical Examinations and Standards (Mar. 16, 1999).

Danlos Syndrome type II or III. Prominence of ascending aorta above the ST Junction. Will consider use of B-blockers [with] evidence of progressive Ao enlargement." The record also contains an unsigned letter, dated June 16, 2000, provided by facsimile copy to Captain Mark Miliam, the plaintiff's military counsel, stamped "DRAFT." [7] Dr. Childers flew back to Ramstein Air Base after her appointment with Dr. Dietz.

On her flight back to Germany to Ramstein Air Base, Dr. Childers experienced difficulties. She complained of chest pains and other symptoms, as reflected in her Aeromedical Evacuation Patient Record, the same document on which Dr. Dietz had written his evaluation. In an e-mail to her attorney, Mr. Fidell, Dr. Childers alleged that her commander, Colonel Phillip DuChamp, met her personally when she got off the plane at Ramstein and told her that "the data is in," that she did not qualify for an MEB despite her new diagnosis, and that "he'd make sure I was unable to remain in Germany."

On June 13, 2000, Dr. Reynolds performed Dr. Childers' out-processing appointment.[8] The parties have stipulated that Dr. Reynolds stated in Dr. Childers' medical record:

> [I]t is agreed that her current diagnoses do not warrant a medical board and that she would be able to continue her duties in her current medical condition, although with a limited profile. Although her condition could progress to requiring a[sic] MEB, there is no current indication and no way to predict future need. Therefore, I will not initiate a medical board.

Dr. Childers alleges that Dr. Reynolds made this decision without physically examining her. Dr. Childers also alleges that during the appointment, Dr. Reynolds tore up her previous profile and substituted it with this new profile, which, Dr. Childers claims, was drawn up before the appointment

and before he received or read Dr. Dietz's report from Johns Hopkins.

Dr. Childers alleges that she requested orally on June 14, 2000 and June 27, 2000 to remain on active duty. She also alleges that her commanding officer, Colonel DuChamp, told her that such a request would not be recommended for approval.

On June 16, 2000, Dr. Childers filed an appeal to the 86th Medical Group Commander with the aid of her military counsel, Captain Mark Milam, regarding the restrictions on her clinical practice privileges. Dr. Childers submitted a statement of exceptions to the decision to restrict her privileges to 100% supervision and to require retraining. Dr. Childers contended that, in making its decision, the Hearing Committee relied solely on the testimony and the practice review by Dr. Cozza and did not complete an independent review of the evidence or of any of her patient records. According to the plaintiff, the Hearing Committee also failed to consider that Dr. Childers was not provided adequate supervision and mentorship as a new doctor. In addition, Dr. Childers indicated in her appeal that she had suffered from physical ailments over the last two years, which had been newly diagnosed, and which had contributed to her alleged problems. The appeal was focused solely on Dr. Childers' status as a physician and requested:

> For these above reasons, we respectfully ask that you not impose the recommendation of the hearing committee. Rather, based upon a thorough reading of the hearing transcript, as well as a review of the patient records, we believe that monitoring and evaluation of Dr[.] Childers' practice would ensure that she understand, and can render, appropriate care of patients. This preliminary action would permit rectification of perceived problems Dr[.] Childers may have without a perma-

---

**7.** Dr. Dietz's letter is presented in the administrative record as a facsimile copy to Captain Mark Milam. The comments section on the facsimile cover sheet contains the following message: "Dr. Dietz has been out of town and not available to sign his final copy, but here is his draft of his dictation. We will fax the final version when he signs it. I hope this will be good enough for

now.–Melissa Patterson." The administrative record does not contain a signed copy.

**8.** Dr. Childers claims that her appointment with Dr. Reynolds was made for her by Major McDonnell, also an Air Force doctor, before her arrival to Germany on orders from Colonel DuChamp.

nent stain upon her medical credentials and practice.

This appeal did not address Dr. Childers' request for an MEB or suggest that she was unfit to practice as a psychiatrist in the military. On June 22, 2000, six days later, and although she also claims she had asked to remain in the military on June 14, 2000 and on June 27, 2000, Dr. Childers sent an e-mail to Dr. Reynolds [9] to reiterate her belief that she qualified for an MEB. She attached Dr. Dietz's draft, cited to selected Air Force Instruction provisions, and set out her reasons, including citations to her family's medical history, for believing she qualified for an MEB. In her e-mail, she also referred to congenital anomalies and other symptoms she alleged she had experienced while on active duty, such as foot problems, chronic back pain, spontaneous tennis elbow, arthritic-feeling hands, dysgraphia, regurgitation and jaw pain.

On June 26, 2000, one month after she appealed the Hearing Committee's medical practice supervision restriction to the Medical Group Commander, Colonel Courtney Scott, the 86th Medical Group Commander, sent a memorandum to Dr. Childers to announce his final decision. In the first paragraph, Colonel Scott adopted the Hearing Committee's recommendation and elaborated on the restriction:

> I am approving the recommendations of the Credential Review Function and direct that you be granted restricted clinical privileges. For you to practice within the 86th Medical Group, you will need to undergo 100% direct clinical supervision from a board certified child and adolescent psychiatrist. This direct supervision specifically means that your supervisor must be physically present for part or all of every clinical visit to precept you, review the case, and co-sign chart entries before the patient/family leave the clinic. Your privileges will remain restricted until you demonstrate the ability to practice independently in a clinically competent fashion and within the standard of care for a period of at least one year. Monthly updates will be

presented in writing to the Credentials Review Function by your direct supervisor outlining your progress towards attaining this goal.

In the second paragraph, Colonel Scott advised Dr. Childers of her right to appeal his decision to the Air Force Medical Operations Agency (AFMOA) within ten calendar days. Colonel Scott did not include a requirement that Dr. Childers should complete a two-year education program in child and adolescent psychiatry.

Four days later, on June 30, 2000, Dr. Childers separated from the Air Force upon completion of her active duty service commitment, after 8 years and 19 days of military service. Dr. Childers claims that she did not request the separation, but that her June 30, 2000 Release from Active Duty date [RELAD] was a function of the expiration of her Health Professions Scholarship Program [HPSP] Active Duty Service Commitment. Furthermore, because her request to remain on active duty was denied, Dr. Childers later argued to the Air Force Board for Correction of Military Records (AFBCMR) that she was wrongly denied the opportunity to receive the supervision that the Medical Group Commander had ordered in order to fully reinstate her professional privileges.

After her separation from the Air Force on June 30, 2000, Dr. Childers filed a claim for service connected compensation with the Department of Veterans Affairs on August 18, 2000. Dr. Childers also sought employment at the Salem Hospital in Oregon. On October 4, 2000, Dr. Howard Baumann, Chairman of the Credential Committee at Salem Hospital, sent Major Kenneth McDonnell, M.D., Chief of Medical Staff of the 86th Medical Group, at Ramstein Air Base in Germany, a letter asking for his opinion of Dr. Childers' clinical abilities, her working relationships with staff, patients and families, her technical skills and her general attitude. Dr. Baumann also included a questionnaire on which Dr. McDonnell could choose a rating from very good, good, fair, or poor, regarding Dr. Childers' clinical knowledge, clinical competence, emotional stability, work habits, par-

---

9. Dr. Childers copied Congressman Wu of Oregon, her attorneys, Captain Milam and Mr. Fidell (her counsel of record in this court), as well as Major McDonnell.

ticipation in staff activities, and Dr. Childers' relationship to staff and patients. Dr. McDonnell rated Dr. Childers between good and fair in all the available criteria. He indicated that he had known Dr. Childers for one year, that he recommended Dr. Childers with reservation and included a letter to explain. Dr. McDonnell's letter stated that Dr. Childers' credentials were placed in abeyance and then suspended because of job performance concerns. Dr. McDonnell continued:

> Independent review of Dr. Childers' clinical practice revealed concerns with her clinical data gathering, formulation and execution of therapeutic plans, and collaboration with her clinical colleagues. It was recommended that her clinical privileges be restricted but not revoked and that she be placed under the supervision of a competent Child and Adolescent Psychiatrist for a period of one year. These findings were upheld by the Credentials Committee, Credentials Hearing, and appeal to the 86th Medical Group Commander. Final appeal is currently at the level of the Surgeon General of the Air Force.

He also stated that Dr. Childers was diagnosed with ADHD and a variant of EDS, but that "[t]hese diagnoses did not disqualify her from continued medical practice." Dr. Baumann wrote back to Dr. McDonnell on November 21, 2000 to thank him for his "candid response" and asked for further information, specifically regarding "[d]ifficulties with Dr. Childers' clinical data gathering, formulation and execution of therapeutic plans, and collaboration with her clinical colleagues." He also inquired, besides the "on-call incident on 10/99," whether there were other specific examples that would assist the Salem Hospital Credentials Committee in its review of Dr. Childers' practice.[10] The record does not indicate whether Dr. McDonnell replied or whether Dr. Childers was eventually hired at Salem Hospital.

Dr. Childers continued to pursue her appeal regarding her professional credentials. On September 8, 2000, Dr. Childers submitted a Provider Appeal at the AFMOA from the final decision of the Medical Group Commander. In her Provider Appeal, Dr. Childers' assertions included that: (1) Dr. Childers' first assignment in a non-training billet to Germany was made without regard to Dr. Childers' previously diagnosed ADHD, in violation of applicable regulations; (2) Dr. Childers faced inadequate children and adolescent psychiatry resources, while she had a substantially heavier caseload than the other therapists; (3) Dr. Childers' advocacy for her patients and families led to serious friction with her supervisors after she reported to a Department of Defense Dependents Schools (DoDDS) hotline that DoDDS and local Military Treatment Facilities were failing to comply with applicable regulations;[11] (4) Dr. Childers bore the brunt of severe interpersonal conflicts within the unit, which took a toll on her ability to perform her assigned functions; (5) the command failed to deal proactively with the personnel management

---

10. The record also contains a "To Whom It May Concern" letter of recommendation, dated August 15, 2000, from Captain David Kaye, Chaplain, United States Air Forces in Europe. He stated that he "highly recommended her for any job she may seek." He explained that he had shared many clients and their parents with Dr. Childers and that he was impressed with her professionalism and integrity as a clinician. He concluded that "[Dr. Childers] possesses many talents as well as clinical knowledge and skills, allowing her to effectively handle the most difficult cases." Although both parties stipulate to the letter and its contents, the administrative record does not indicate whether Dr. Childers presented this letter to the Salem Hospital or any other employer.

11. Following her call to the DoDDS hotline, on October 5, 1998, Dr. Childers wrote a letter and submitted a four-page report titled "COMPROMISED SERVICES: DEPARTMENT OF DEFENSE DEPENDENTS SCHOOLS IN THE KAISLERSLAUTERN MILITARY COMMUNITY," which she alleges eventually reached General Wesley K. Clark, U.S. Army. After her supervisors became aware of the letter on October 15, 1998, Dr. Childers believes that "she was faulted by her supervisors for having undertaken that initiative outside official channels." Dr. Childers wrote in her appeal that "[t]his episode had a highly corrosive effect on her relations with command." She also alleges that after Dr. Childers contacted the Ramstein Inspector General about her concerns "she was threatened with a medical evaluation board (MEB), with a view to effecting her medical discharge from the Air Force," which she appears not have wanted at the time.

and other aspects of its responsibilities;[12] and (6) the command failed to accommodate Dr. Childers' ADHD disability and to implement additional accommodation strategies, such as providing access to a computer and a filing cabinet.[13] Plaintiff also made procedural objections to the process the command had employed, including her complaint that two of the officers on her Credentials Review Team had the duty to recuse themselves and that the Air Force improperly applied its own Instructions.

In her 17–page Provider Appeal to the AFMOA on the subject of her professional credentials, Dr. Childers only briefly mentioned her personal medical conditions and her intention to pursue her remedies regarding her medical status. In the context of describing the unfair treatment she claims she received at the time of her departure from the Air Force, Dr. Childers indicates, in parentheses, her intention to take "further administrative remedies" regarding disability retirement. The entire paragraph is reproduced below:

> Shadowed by an enlisted escort as if she were receiving an other than honorable discharge, she was pronounced fit for worldwide duty without an MEB (notwithstanding her diagnosed ADHD, boardable aortic defect, Ehlers–Danlos Syndrome, and osteoporosis) and outprocessed only a few days after the command's final decision, her request to extend having been denied. Emails from Dr. Childers describing her condition and the highly unprofessional fast-shuffle she received in connection with her final medical processing are attached. Encls. 19–20. (It is anticipated that further administrative remedies will be invoked to rectify the denial of her right to proper consideration for disability retirement.) To treat an active duty member in this fashion is reprehensible; to treat a fellow member of the U.S. Air Force Medical Service—even one who has

been involved in a credentialing hearing—is vindictive and shocking.

Dr. Childers wrote about her ADHD, EDS, and osteoporosis in two other paragraphs, under the "Extenuation and Mitigation" section of her AFMOA Appeal, in the context of explaining that her "ailments contributed to some of the problems she was alleged to have had in her practice." Dr. Childers provided only two specific examples of how these ailments affected her practice, namely her handwriting and organizational skills. The two paragraphs submitted by Dr. Childers in the AFMOA Appeal are as follows:

> 1) There was unrebutted evidence that Dr. Childers was diagnosed as suffering from ADHD after entering on active duty but before she reported to Germany. ADHD and various physical ailments have plagued her over the last two years. Thus, she suffers from osteoporosis (she is non-menopausal), Encl. 23, and was diagnosed at Johns Hopkins University with Ehlers–Danlos Syndrome Hypermobility/Vascular Type, a debilitating condition. Encl. 24; *see generally* S.R. Ainsworth & P.D. Aulicino, *A Survey of Ehlers–Danlos Syndrome,* www.ednf.org/articles/survey1.html, Encl. 25. Diagnostic information obtained since the hearing confirms that these ailments contributed to some of the problems she was alleged to have had in her practice, *e.g., handwriting and organizational skills.*

There is a rich and practical literature on work-site accommodation for persons diagnosed with ADHD. *E.g.,* Mayda LaRosse, *Work–Site Accommodations to Consider for People with Learning Disabilities and/or Attention Deficit Disorders* (1999). The record demonstrates that Dr. Childers' command was profoundly ineffective insofar as the reasonable accommodation

12. Dr. Childers cited to Major Kutz's report, performed in May 1998, in which he stated: "I believe that some of the problematic issues surrounding Dr. Childers' practice are actually the result of a failure of her supervisory chain to act quickly in response to difficulties which were noticed very early in her tour at the PBM [Pediatric Behavioral Medicine Clinic]."

13. As an example of the commander's failure to accommodate Dr. Childers' ADHD, Dr. Childers stated that she was the only provider not to receive a computer when the 86th Medical Group received 163 new computers in 1998. She obtained a computer two months later.

of her ADHD is concerned. And if her condition was such that it could not be accommodated in a military environment, it would certainly seem that her overseas assignment, if not, indeed, her accession into the Air Force, was improvident. *See* Ex. 7 (¶ 2f). In either event, it was incumbent on command to address the matter proactively and energetically rather than to permit the kind of prolonged ordeal this record shows.

(emphasis added).

Dr. Childers requested to review and comment on evaluations submitted in connection with her appeal, and if the appeal was referred to the Air Force Medical Practice Review Board, she asked to submit comments to its recommendation before the AFMOA made a final decision. Dr. Childers claimed in her later appeal to the AFBCMR that her requests were ignored and that the decision of the Air Force Medical Practice Review Board was delayed to her prejudice since Dr. Childers was forced to disclose the adverse action to her state licensing agency and to potential employers.

In a letter, dated April 9, 2001, Major Kimberly Robinson, Chief of Professional Staff Actions, AFMOA, Office of the Surgeon General, informed Dr. Childers of the AFMOA's decision to overturn the Medical Group Commander's 100% supervision restriction:

> The Commander, Air Force Medical Operations Agency, reviewed your appeal of the 86 MDG/CC [Medical Group Commander] restriction of your clinical privileges. After consideration of the recommendations of the Medical Practice Review Board, he overturned the restriction and directed that your privileges be reinstated, with a required period of monitoring and evaluation, and that the record reflect this decision. This action was not reported to the National Practitioner Data Bank [14] or your state licensure.
>
> If you have further questions regrading this matter, please contact [Major Kimberly J. Robinson, Chief, Professional Staff Actions, Air Force Medical Operations

Agency, Office of the Surgeon General] at the above address. . . .

On April 11, 2001, in response to the AFMOA's letter, Mr. Fidell, Dr. Childers' counsel, inquired on behalf of Dr. Childers what "the required period of monitoring and evaluation" meant in Dr. Childers' situation, since Dr. Childers already had been discharged from the Air Force and such a plan could not be implemented. Major Robinson replied that Dr. Childers' record would indicate that her clinical privileges were reinstated with a period of monitoring and evaluation as an indication of her status at the time she separated from the Air Force, and that such information would be included in responses to inquiries about her.

Dr. Childers' counsel made several requests for more information on the AFMOA's deliberations. Subsequently, Dr. Childers was provided with a redacted copy of a March 28, 2001 letter that reported the outcome of the Air Force Medical Practice Review Board's deliberations. In the March 28, 2001 letter, the AFMOA reasoned that the Commander's decision to suspend her privileges was inappropriate because: (1) "the Hearing Committee had insufficient information to draw conclusion that [Dr. Childers was] not fully competent" and the samples of Dr. Childers' cases which were reviewed were not randomly selected; (2) "[t]he Hearing Committee recommended the 100% supervision restriction for one year with the knowledge that Dr. Childers would be separating from the Air Force and would not have the opportunity to have her clinical privileges completely reinstated;" and (3) there was "evidence of a hostile work environment." The letter also indicated that the AFMOA found that the Medical Group Commander should have put in place the original monitoring and evaluation plan recommended by Major Kutz after his review of her clinical practice in April 1998. The AFMOA reasoned that "[h]ad this plan been carried out, the concerns regarding her ability to set limits on her practice could have been adequately addressed." Redactions

---

14. The National Practitioner's Data Bank is an organization that collects and distributes data on the professional competence and conduct of physicians.

were made to remove "specialty or legal advice." Because of the redactions, however, Dr. Childers argued to the AFBCMR, that said she had no way to find out what advice the unnamed Clinical Reviewer or Legal Advisor had given to the AFMOA, or on what grounds the AFMOA had rejected her procedural objections.

On June 11, 2001, unsatisfied with the AFMOA's decision, Dr. Childers applied to the AFBCMR.[15] Dr. Childers requested that: (1) her records be cleared of all references to the suspension and credentialing action against her; (2) her records be corrected to show she remained on active duty until June 30, 2001 (one year after she left the service), with all applicable back pay and allowances due to the one-year monitoring requirement; and (3) she be granted an MEB followed by a PEB to determine if she was fit for duty, or, in the alternative, entitled to retirement or severance pay, depending on the awarded percentage rating.

The members of the AFBCMR requested, received and reviewed several inputs for their consideration prior to reaching a decision. The first one, dated September 26, 2001, was submitted by Colonel Frederick W. Hornick, M.D., Chief Medical Consultant for the AFBCMR and Medical Advisor to the Air Force Personnel Council. The second, dated October 31, 2001, was authored by Mr. Norman Saucier, Air Force Personnel Center's Air Force Physical Disability Division. The third, dated February 12, 2002, was received from Major Kimberly J. Robinson, Chief, Professional Staff Actions at the AFMOA, Office of the Surgeon General. The fourth evaluation, dated May 13, 2002, was submitted by Mr. Harlan Wilder, the AFBCMR's legal advisor.

The medical consultant, Dr. Hornick, stated:

> She [Dr. Childers] is seeking a retroactive Medical Evaluation Board/Physical Evaluation Board for medical conditions discov-

ered in the course of her military service which, in actuality pre-dated her entry to the military.

\* \* \*

> The applicant's [Dr. Childers'] recognized medical and psychological disorders were not unfitting for performance of her military duties once she was already commissioned. Appropriate evaluations and treatments were initiated for the established diagnoses. The EDS is not cause for a finding of unfitness and clearly was a part of the applicant's genetic makeup that she brought with her to the military. As she has no unfitting conditions upon which to base disability processing, she was appropriately not evaluated in that system, and approval of her present request for such disability consideration is not warranted or recommended.

Regarding Dr. Childers' request to expunge her military records of the credentialing action taken at Ramstein Air Force Base, Dr. Hornick wrote:

> In view of the follow-up action taken by AFMOA in this case, there was, in essence, no valid credentialing action in the first place, and removal of all references to such action would be appropriate. This office would defer final recommendation on this matter to appropriate legal authorities for their review and advisory.

Dr. Hornick also concluded that Dr. Childers' request for back pay and allowances for an "unfulfilled" one-year extension did not appear to be valid.

The conclusion of the second evaluator, Mr. Saucier, that no MEB was warranted, was similar to that of Dr. Hornick. Mr. Saucier wrote: "Although some previous mention was made in her medical records that she was going to undergo an MEB, a review of the medical data from her 14 Jun [sic] 2000 [16] appointment does not point to any severe or grave medical conditions which

---

**15.** According to the jointly agreed to stipulation of facts, at the time of her appeal to the AFBCMR, Dr. Childers held an unrestricted license to practice medicine in Oregon and was a practicing physician.

**16.** Although Mr. Saucier refers to an appointment on June 14, 2000, both parties suggest that Mr. Saucier is referring to the appointment Dr. Childers had with Dr. Reynolds on June 13, 2000.

would have required that she be presented before an MEB." Mr. Saucier then quoted Dr. Reynold's evaluation from the June 13, 2000 appointment, denying an MEB, and cited Dr. Childers' last performance report in which she had received laudatory comments concerning her duty performance and the highest rating attainable. Mr. Saucier stated "Her military records clearly reflect that she was able to perform her military duties right up until her discharge date." Mr. Saucier also noted that: "The fact that a person may have had a medical condition while on active duty does not automatically mean that the condition is unfitting for continued military service."

In addition, the AFBCMR received a letter, dated February 12, 2002, from Major Robinson, Chief, Professional Staff Actions, AFMOA, Office of the Surgeon General. She recommended denial of Dr. Childers' request to expunge her records of the suspension restriction on the basis that the suspension was appropriately authorized at the discretion of the commander who had a valid reason to issue the suspension. Major Robinson indicated, however, that if the AFBCMR's final decision was to grant Dr. Childers relief, all evidence of the suspension should be removed.

While the AFBCMR was deliberating, Dr. Childers was informed by letter, dated January 23, 2002,[17] of her Department of Veterans Affairs disability ratings. According to the letter, Dr. Childers had filed a claim with the DVA in August 2000 and was physically examined on November 22, 2000. She received a 50% disability rating from the DVA for the service connection to her ADHD, but 0% for the service connection to her gastroesophageal disorder, and the service connection rating was deferred for osteoporosis, EDS with possible heart involvement, hearing loss, bilateral shoulder disability, neck disorder, and bilateral eye condition. Dr. Childers submitted the DVA decision and it was made part of her record at the AFBCMR.

On March 8, 2002, Dr. Hornick's and Mr. Saucier's evaluations, as well as the letter

from Major Robinson, were forwarded to Dr. Childers via her counsel, Mr. Fidell. Mr. Fidell responded to the AFBCMR regarding Dr. Hornick's and Mr. Saucier's evaluations with a 12–page memorandum, often repeating arguments previously submitted and characterizing Dr. Childers' physical examination by Dr. Reynolds as a "sham." On behalf of Dr. Childers, Mr. Fidell disputed Dr. Hornick's opinion as flawed because his comments were conclusory regarding plaintiff's EDS and he failed to address Dr. Childers' other symptoms and conditions.

The AFBCMR also received an evaluation from the Air Force's legal counsel, Mr. Wilder, dated May 13, 2000. Mr. Wilder concurred with Dr. Hornick's and Mr. Saucier's evaluations to grant removal of all references to the credentialing action and to deny Dr. Childers' request for an MEB/PEB. He further recommended denial of her request to show that she had remained on active duty for an additional year, until June 30, 2001. According to Mr. Wilder:

> Under AFI 36–3207, para 2.3, an officer desiring to separate at the end of his or her completion of required active service must submit an AF Form 780, *Officer Separation Actions,* at least six months prior to the desired date of separation (DOS). Paragraph 2.14 permits the withdrawal of separation requests up to 30 days prior to the DOS for any reason, but permits withdrawal requests within 30 days of the DOS only for hardship. According to [Dr. Childers] on 14 June 2000, 17 days before her DOS, and again one week later, she requested to remain on active duty but was told that her request "would not be recommended for approval." Apparently, as a result, [Dr. Childers] did not submit a formal withdrawal request and thus her request was not formally denied. Nevertheless, given the absence of a hardship, her request to remain on active duty should have been denied had she formally submitted it. Accordingly, there was no error or injustice in this regard.

(emphasis in original).

On June 3, 2002, Mr. Fidell, Dr. Childers' counsel, responded to the AFBCMR regard-

---

17. The DVA letter was stamped "Jan 23, 2002." The Complaint states that "The Department of

Veterans Affairs rated plaintiff 50% disabled on January 30, 2002."

ing Mr. Wilder's letter by expanding on the circumstances surrounding Dr. Childers' departure from the Air Force and her request to stay in the service. He explained that Dr. Childers did not request the separation, rather that her June 30, 2000 RELAD (Release from Active Duty) date was a function of the expiration of her HPSP (Health Professions Scholarship Program) Active Duty Service Commitment, and not due to a request on her part to be released. Mr. Fidell also commented briefly on Dr. Childers' request for access to the MEB/PEB process.

On July 1, 2002, the AFBCMR issued its decision. The AFBCMR recommended that:

The pertinent military records of the Department of the Air Force relating to AP-PLICANT, be corrected to show that all references to the suspension and credentialing action against her, including but not limited to, the decision of the Air Force Medical Practice Review Board, the requirement to undergo a period of monitoring and evaluation, and all other adverse information related to this action be removed from her records and sequestered.

(emphasis in original).

Although the AFBCMR granted Dr. Childers' first request to delete all references to the period of monitoring and evaluation from Dr. Childers' records, the AFBCMR denied Dr. Childers' request to change her military records to show that she remained on active duty for an additional year beyond her actual separation date. The AFBCMR did not agree with Dr. Childers that the requirement placed on her for a one-year period of professional monitoring and evaluation was a basis for her to have been retained or credited for an additional year of active duty. The AFBCMR found the monitoring requirement and Dr. Childers' impending separation to be "a coincidence of timing" with "no evidence that the amount of time [Dr. Childers] had left in service was a determinant in the moni-

toring requirement." Regarding Dr. Childers' request for an MEB and disability retirement or severance pay, the AFBCMR found:

Insufficient relevant evidence has been presented to demonstrate the existence of error or injustice regarding the applicant's request for a Medical Evaluation Board and her request that her record reflect that she was retained on active duty for a year beyond her present separation date.

Thereafter, Dr. Childers filed a complaint with the United States Court of Federal Claims seeking review of the AFBCMR's decision.

## DISCUSSION

Dr. Childers requests the court to direct the Air Force to amend her service and medical records to reflect that she was personally retired from the date of her separation from active duty by reason of disability. Dr. Childers alleges that at the time of her separation from the Air Force, she suffered from medical conditions that rendered her unfit for duty, that she was entitled to an MEB, and that had she been afforded an MEB her conditions should have resulted in a rating of at least 30% disabled for retirement purposes.[18] According to the plaintiff, the denial of her request for an MEB was arbitrary, capricious, an abuse of discretion, unsupported by substantial evidence and in violation of the law. She also argues that the Air Force decision to deny an MEB, and the recommendations on which the AFBCMR relied, were erroneous because Dr. Reynolds did not examine Dr. Childers. Moreover, plaintiff alleges that those who reviewed her record ignored evidence of her medical conditions and relied on Dr. Reynold's prejudicial medical opinion, rather than on the opinion of Dr. Abbott who had examined her and had recommended an MEB.[19] In her complaint,

---

18. In the complaint filed with this court, Dr. Childers seeks a disability rating of at least 30%. However, in her response to the defendant's motion for judgment on the administrative record, her cross-motion for judgment on the administrative record and in her reply to the defendant's response to cross-motion for judgment on the administrative record, Dr. Childers seeks a rating of at least 50%, not 30%.

19. As discussed earlier, Dr. Abbott's diagnosis of Marfan Hypermobility syndrome with osteoporosis and a dialated aortic root turned out to be incorrect, after Dr. Dietz diagnosed EDS. The plaintiff does not contest Dr. Dietz' revision of her diagnosis.

plaintiff does not seek reinstatement of her medical credentials since that issue previously was addressed in her favor, nor does she raise the issue of a deemed a one-year extension of her separation date. Her filings with the court, however, attempt to interweave her professional difficulties with allegations that the denial of an MEB was part of a pattern of unfair treatment she allegedly received.

The government responds that the decision of the Air Force to deny Dr. Childers an MEB was correct and that the AFBCMR properly reviewed the records and upheld the actions of the responsible Air Force officials. The defendant also argues that Dr. Childers did not carry the burden of proof assigned to her to demonstrate that an MEB was improperly denied or that her medical conditions rendered her unfit to perform her duties as a child and adolescent psychiatrist at the time of her discharge.

The parties have filed cross-motions for judgment on the administrative record. The Rules of the Court of Federal Claims (RCFC) provide for judgment upon the administrative record, and the parties have filed such cross-motions. *See* RCFC 52.1. In disability retirement claims, the United States Court of Federal Claims "has no jurisdiction over disability retirement claims until a military board evaluates a service member's entitlement to such retirement in the first instance." *Chambers v. United States,* 417 F.3d 1218, 1225, *cert. denied,* 546 U.S. 1066, 126 S.Ct. 807, 163 L.Ed.2d 635 (2005). This court then reviews the correction board's decision to determine whether the board's determination was "arbitrary, or capricious, or in bad faith, or unsupported by substantial evidence, or contrary to law, regulation or mandatory published procedure of a substantive nature by which plaintiff has been seriously prejudiced, and money is due." *Sanders v. United States,* 219 Ct.Cl. 285, 298, 594 F.2d 804, 811 (1979); *see also Chappell v. Wallace,* 462 U.S. 296, 303, 103 S.Ct. 2362, 76 L.Ed.2d 586 (1983); *Porter v. United States,* 163 F.3d 1304, 1316 (Fed.Cir. 1998), *cert. denied,* 528 U.S. 809, 120 S.Ct. 41, 145 L.Ed.2d 37 (1999); *Skinner v. United States,* 219 Ct.Cl. 322, 332, 594 F.2d 824, 830

(1979). This standard of review "does not require a reweighing of the evidence, but a determination *whether the conclusion being reviewed* is supported by substantial evidence." *Heisig v. United States,* 719 F.2d 1153, 1157 (Fed.Cir.1983) (emphasis in original); *see also Colon v. United States,* 71 Fed.Cl. 473, 485–86 (2006), *aff'd sub nom. Acevedo v. United States,* 216 Fed.Appx. 977 (Fed.Cir.2007); *Garcia v. United States,* 40 Fed.Cl. 247, 254 (1998).

The United States Court of Federal Claims does not sit as a "super correction board." *Skinner v. United States,* 219 Ct.Cl. at 331, 594 F.2d at 830. " 'When substantial evidence supports a board's action, and when that action is reasonable in light of all the evidence presented, the court will not disturb the result.' " *Van Cleave v. United States,* 70 Fed.Cl. 674, 678–79 (2006) (quoting *Pope v. United States,* 16 Cl.Ct. 637, 641 (1989)). Judicial review of a correction board should not be an opportunity for courts to substitute their judgment for that of the military board when reasonable minds could reach differing conclusions. *See Sanders v. United States,* 219 Ct.Cl. at 303–05, 594 F.2d at 814–15. Stated otherwise, responsibility for determining whether a service member is fit or unfit to serve in the armed forces is not a judicial decision, and "courts cannot substitute their judgment for that of the military departments when reasonable minds could reach differing conclusions on the same evidence." *Heisig v. United States,* 719 F.2d at 1156; *see also Martinez v. United States,* 77 Fed. Cl. 318, 324 (2007), *aff'd,* 260 Fed.Appx. 298 (Fed.Cir.2008). The United States Supreme Court has noted that "judges are not given the task of running the Army.... The military constitutes a specialized community governed by a separate discipline from that of the civilian." *Orloff v. Willoughby,* 345 U.S. 83, 93–94, 73 S.Ct. 534, 97 L.Ed. 842, *reh'g denied,* 345 U.S. 931, 73 S.Ct. 779, 97 L.Ed. 1360 (1953); *see also Porter v. United States,* 163 F.3d at 1316. Moreover, "[j]udicial deference to administrative decisions of fitness for duty of service members is and of right should be the norm." *Maier v. Orr,* 754 F.2d 973, 984 (Fed.Cir.), *reh'g denied,* 758 F.2d 1578 (Fed.Cir.1985).

In addition, this court must recognize the strong presumption of regularity accompanying government proceedings, including that the military generally carries out its responsibilities properly, lawfully and in good faith. *See Richey v. United States,* 322 F.3d 1317, 1326 (Fed.Cir.2003); *Porter v. United States,* 163 F.3d at 1316. The plaintiff bears the burden of overcoming the "strong, but rebuttable, presumption" that the military discharges its duties "correctly, lawfully, and in good faith." *Bernard v. United States,* 59 Fed.Cl. 497, 501 (quoting *Hary v. United States,* 223 Ct.Cl. 10, 17, 618 F.2d 704, 707 (1980) (citations omitted)), *aff'd,* 98 Fed. Appx. 860 (Fed.Cir.2004).

In *Fluellen v. United States,* the court wrote:

> The plaintiff bears the burden of showing that the AFBCMR's action was arbitrary, capricious, unsupported by substantial evidence, or contrary to applicable statutes and regulations. *Wronke v. Marsh,* 787 F.2d 1569, 1576 (Fed.Cir.1986); *Hoskins v. United States,* 40 Fed.Cl. 259, 271–72 (1998). To prevail under the arbitrary and capricious standard, plaintiff must demonstrate that evidence was ignored or unreasonably construed, or that designated duties were not performed by the AFBCMR. *Kirwin [v. United States],* 23 Cl.Ct. [497], 502 [(1991)]. Moreover, "plaintiff must overcome the presumption that 'administrators of the military, like other public officers, discharge their duties correctly, lawfully, and in good faith.'" *Chayra v. United States,* 23 Cl.Ct. 172, 178 (1991), quoting *Sanders [v. United States],* 219 Ct.Cl. at 302, 594 F.2d at 813. "While the court might disagree with the board's decision, it cannot substitute its own judgment for the board's if reasonable minds could reach differing resolutions of a disputed fact." *Chayra,* 23 Cl.Ct. at 178–179.

*Fluellen v. United States,* 44 Fed.Cl. 97, 101 (1999), *aff'd,* 225 F.3d 1298 (Fed.Cir.), *reh'g denied* (2000); *see also* 32 C.F.R. § 865.4(a) ("The applicant has the burden of providing sufficient evidence of probable material error or injustice."); *Fisher v. United States,* 402 F.3d 1167, 1180 (Fed.Cir.2005).

Pursuant to Air Force Instructions: "In order to maintain a fit and vital force, the Secretary of the Air Force relies on disability laws to remove active duty ... members who can no longer perform their military duties because of a mental or physical defect." AFI 41–210, Patient Administration Functions, ¶ 10.1.1 (Mar. 22, 2006). According to AFI 41–210, "The MEB is the first step in the Air Force disability evaluation process to determine who is not worldwide qualified." AFI 41–210, ¶ 10.1.1. In addition, Air Force regulations state that a member's Health Care Provider "[i]dentifies individuals for Medical Evaluation Board (MEB) if qualification for continued military service is questionable." AFI 48–123, Medical Examinations and Standards, ¶ 2.4 (Mar. 16, 1999).

"The sole standard to be used in making determinations of unfitness due to physical disability shall be unfitness to perform the duties of the member's office, grade, rank or rating because of disease or injury." Department of Defense Directive (DODD) 1332.18, Separation or Retirement for Physical Disability, ¶ 3.3 (Nov. 4, 1996). Retirement or separation due to physical disability requires certain additional determinations outlined in the DODD. "A medical impairment or physical defect standing alone does not constitute a physical disability. To constitute a physical disability, the medical impairment or physical defect must be of such a nature and degree of severity as to interfere with the member's ability to adequately perform his or her duties." Department of Defense Instruction (DODI) 1332.38, Physical Disability Evaluation, ¶ E2.1.25 (Nov. 14, 1996).

According to AFI 41 –210:

> It is the responsibility of all Medical Corps officers to identify service members for MEB whose qualification for worldwide duty is questionable. Refer the member for MEB action within *30 days* after a complete work-up and a definitive diagnosis has been made. During the medical work-up ensure the member is placed on a 4T profile. **NOTE:** Do not mark the MEB block on the 4T profile if the evaluations are incomplete and a determination cannot be made that the member requires

a MEB processing. The Medical Corps officer initiates notification of an MEB action via AF Form 570, Notification of Patient's Medical Status, and forwards it to the action officer (PEBLO). He/she must also notify the Force Health Management office or PCM for active duty members and the ARC medical facility for ARC members of the need to complete a 4T profile on the members. When MEB notification is made on an ARC member, the member's supporting ARC medical unit will be notified by the PEBLO to determine the member's entitlement to disability processing. The MEB should arrive at HQ AFPC/DPPD or HQ AFPC/DPPAM (as appropriate) for active duty members or to the appropriate ARC/SGP for ARC members within 30 days from the dictation of the narrative summary. Under no circumstances will a case be accepted for adjudication if any part of the board AFI41–210 22 MARCH 2006 133 package is older than 90 days without a recent update of patient's current medical status. The function of the MEB is to identify those members who are not worldwide qualified. The decision requiring fitness lies with the Air Force DES. Title 10 U.S.C., Chapter 61, provides for full and fair hearing and adjudication by a series of boards, with the Secretary of the Air Force or designee making the final decision on retention or separation.

AFI 41–210, Patient Administration Functions, ¶ 10.3.1 (emphasis in original).

The government argues that the Secretary of the Air Force is entitled to presume Dr. Childers was fit for duty if she was adequately performing her duties in the 12 months prior to her discharge on June 30, 2000, pursuant to DODI 1332.38, ¶ E3.P3.5 and AFI 36–3212, ¶ 3.17. According to the government, the presumption applies if Dr. Childers performed her duties satisfactorily any time after June 30, 1999 through June 30, 2000, the date of her separation. Dr. Childers argues that the presumption does not apply because the administrative record does not contain evidence that she was satisfactorily performing her duties throughout the 12–month period because she did not perform her duties as a child and adolescent

psychiatrist after her privileges were placed in abeyance in October 1999. Dr. Childers, however, does not deny that she performed her duties from July 1, 2000 to the abeyance of her privileges in October 2000.

To overcome the presumption, Dr. Childers cites AFI 44–157, ¶ 1.3, which states:

The existence of a physical defect or condition does not of itself necessarily provide justification for or entitlement to an MEB. The law which provides for military disability, Title 10 U.S.C., Chapter 61, is not used to bestow additional benefits upon those approaching retirement or separation. If a member has performed his or her duty satisfactorily prior to scheduled retirement or an approved separation date, a presumption of fitness is established. This presumption of fitness can be overcome only if it is established by a preponderance of evidence that one of the following exists:

1.3.1. Within the presumptive period an acute, grave illness or injury occurs that would prevent the member from performing further duty, if he or she were not retiring, or a serious deterioration of a previously diagnosed condition occurs that would prevent the member from performing further duty immediately prior to or concurrent with the processing from normal retirement.

AFI 44–157, Medical Evaluation Boards (MEB) and Continued Military Service, ¶ 1.3.1 (Dec. 12, 2000).

To rebut the presumption, Dr. Childers relies on her Physical Profile Serial Report on which Dr. Abbott revised Dr. Childers' medical profile based on a diagnoses of Marfan Hypermobility Syndrome, with osteoporosis and dilated aortic root and reclassified her to a P–4–T temporary profile. Yet, Dr. Abbott did not indicate that Dr. Childers' illness was acute or grave in the report. Any allegation by Dr. Childers that her illness was acute is refuted by Dr. Dietz's subsequent diagnosis of EDS, on which Dr. Childers also based her MEB request. Dr. Dietz, determined that Dr. Childers' aorta was not enlarged, that Dr. Childers should continue to remain active with low intensity aerobic

activities, and that she should have a follow-up examination in nine months, all of which strongly suggest that, shortly before her completion of her service commitment, her EDS was not acute or grave. He did not indicate that Dr. Childers was unable to perform her military responsibilities as a child and adolescent psychiatrist. Moreover, Dr. Childers does not present any evidence that she suffered from an acute, grave illness or injury that would have prevented her from further performing her military duties as a child and adolescent psychiatrist. As discussed below, the medical record in plaintiff's case supports the AFBCMR's decision that plaintiff's medical profile did not require an MEB regardless of whether or not the presumption of fitness is in play.

While it is not the responsibility of the courts to place or not place a service member on disability retirement, courts are available to review the service organization's compliance with its own rules and procedures. *See Roth v. United States,* 378 F.3d 1371, 1385 (Fed.Cir.) (holding that "questions of procedural compliance are justiciable"), *reh'g denied* (2004); *see also Murphy v. United States,* 993 F.2d 871, 873 (Fed.Cir.1993), *cert. denied,* 511 U.S. 1019, 114 S.Ct. 1402, 128 L.Ed.2d 75, *reh'g denied,* 511 U.S. 1118, 114 S.Ct. 2123, 128 L.Ed.2d 681 (1994). The court, therefore, reviews whether the AFBCMR's decision was arbitrary, capricious, made in bad faith or not in accordance with the law. As noted above, courts "cannot substitute their judgment for that of the military departments when reasonable minds could reach differing conclusions on the same evidence" and should not sit as a "super correction board." *Heisig v. United States,* 719 F.2d at 1156; *Skinner v. United States,* 219 Ct.Cl. at 331, 594 F.2d at 830 (1979); *Van Cleave v. United States,* 70 Fed.Cl. at 678.

Dr. Childers' request for an MEB was denied by her Health Care Provider, Dr. Reynolds, at her June 13, 2000 out-processing appointment. Dr. Reynolds concluded, based on Dr. Childers' medical records and current diagnoses, that she did not warrant an MEB and that Dr. Childers "would be able to continue her duties in her current

medical condition with a limited profile." He concluded that, although Dr. Childers' condition "could progress to requiring an MEB, there is not current condition and no way to predict future need."

The AFBCMR considered Dr. Childers' lengthy brief requesting that the limitations on her medical practice privileges be removed from her records and that she be deemed to have remained on active duty for a year past her actual separation date, to have allowed her to clear her professional record and credentials following the imposition of the one-year monitoring requirement. Plaintiff's brief to the AFBCMR concentrated on the alleged hostile environment she faced, the allegations brought against her, the suspension of her credentials, Dr. Childers' Provider Appeal to the AFMOA and the AFMOA's decision. Regarding her request for disability processing in her initial brief to the AFBCMR, Dr. Childers made a one-paragraph argument, quoted here in its entirety:

D. *Impartial fitness for duty determination*

In light of the medical information set forth in her Provider Appeal, App. Br. 14 & Encls. 17, 19–20, Dr. Childers should be afforded a proper, impartial medical board followed by a physical evaluation board to determine whether she was fit for duty or, in the alternative, entitled to disability retirement or severance pay (depending on the percentage rating she is awarded). To date she has clearly not been afforded the full and fair hearing which Congress has guaranteed. Her outprocessing from Germany—the last act in a drama in which the command's own legal representative said she had been "set up," App. Br. 10—was obviously a "fast shuffle" after she was improperly determined to be *personna non grata. See* App. Br. 11.

(emphasis in original).

In the paragraph quoted immediately above, Dr. Childers does not state the disability grounds on which she bases her request, nor how her diagnoses may have impaired her ability to perform as a child and adolescent psychiatrist. Instead she referred to page 14 of her AFMOA Appeal, in

which she did not request an MEB, and to the enclosures in support of her AFMOA Appeal. At page 14 of the AFMOA Appeal, Dr. Childers submitted an "Extenuation and Mitigation" section, which includes three subsections that she felt explained considerations that were not reflected in the final decision of the Medical Group Commander. She argued that these considerations "absolutely [had] to be weighed in the balance as a matter of law, Air Force policy, and basic fairness." The first subsection deals with Dr. Childers' medical conditions from her perspective, the second refers to the lack of supervision of Dr. Childers' practice, and the third expands on Dr. Childers' allegations of a hostile work environment.

The medical-condition subsection of her brief to the AFMOA, which Dr. Childers cited in her brief to the AFBCMR, is made up of two paragraphs, the first of which states:

> There was unrebutted evidence that Dr. Childers was diagnosed as suffering from ADHD after entering on active duty but before she reported to Germany. ADHD and various physical ailments have plagued her over the last two years. Thus she suffers from osteoporosis (she is non-menopausal), Encl. 23, and was diagnosed at Johns Hopkins University with Ehlers–Danlos Syndrome Hypermobility/Vascular Type, a debilitating condition. Encl 24; *see generally* S.R. Ainsworth & P.D. Aulicino, *A Survey of Ehlers–Danlos Syndrome,* www.ednf.org/articles/survey1.htm, Encl. 25. Diagnostic information obtained since the hearing confirms that these ailments contributed to some of the problems she was alleged to have had in her practice, *e.g.,* handwriting and organizational skills.

In the second relevant paragraph in her AFMOA Appeal brief, Dr. Childers expands on her ADHD condition and on how she believes the command was "profoundly ineffective" in providing reasonable accommodation for her condition. Since in this paragraph, and in her AFMOA Appeal, Dr. Childers primarily was seeking reinstatement of her clinical privileges, she did not allege that she was unfit to perform her

military duties as a child and adolescent psychiatrist. To the contrary, Dr. Childers sought to continue her professional practice, without restrictions.

In Dr. Childers' brief to this court, Dr. Childers also cites to page 11 in her appeal to the AFMOA. The only paragraph on this page referring to Dr. Childers' medical conditions while in the Air Force is stated here in its entirety:

> Shadowed by an enlisted escort as if she were receiving an other than honorable discharge, she was pronounced fit for worldwide duty without an MEB (notwithstanding her diagnosed ADHD, boardable aortic defect, Ehlers–Danlos Syndrome, and osteoporosis) and outprocessed only a few days after the command's final decision, her request to extend having been denied. Emails from Dr. Childers describing her condition and the highly unprofessional fast-shuffle she received in connection with her final medical processing are attached. Encls. 19–20. (It is anticipated that further administrative remedies will be invoked to rectify the denial of her right to proper consideration for disability retirement.) To treat an active duty member in this fashion is reprehensible; to treat a fellow member of the U.S. Air Force Medical Service—even one who had been involved in a credentialing hearing—is vindictive and shocking.

The record before the AFBCMR also contained an e-mail from Dr. Childers to her counsel, Mr. Fidell, dated August 27, 2000, titled "OxygenDeSat" in which Dr. Childers described her version of her medical problems on her flight back to Ramstein Air Base from Johns Hopkins Hospital, her appointment with Dr. Reynolds, and her final days in Air Force. Also, in the AFBCMR record was Dr. Childers' e-mail to Dr. Reynolds, dated June 22, 2000, titled "Sudden Death and Cardiovascular Concerns," and additional attachments provided by Dr. Childers, including Dr. Childers' June 16, 2000 appeal to the Medical Group Commander in which Dr. Childers submitted a statement of exceptions to the Hearing Committee's decision on her credentialing action. The only mention of Dr. Childers' medical conditions in her state-

ment of exceptions is a final point in which she states she had been recently diagnosed with "ailments" that "may have been contributing factors to some of the alleged problems Dr[.] Childers had in her practice." Her only request based on the alleged "ailments" was that, "These medical problems should be fully investigated, and their accommodation should be considered prior to final action on her clinical privileges." Once again, it is noteworthy that in this statement, submitted less than a month after her appointment with Dr. Abbott, and just three days following her out-processing appointment with Dr. Reynolds, Dr. Childers was seeking reinstatement of her clinical privileges to practice without supervision, not disability retirement. Nor was Dr. Childers arguing that she was unfit for duty; in fact, she had recently requested to remain in the military.

The AFBCMR record also contained Dr. Childers' medical records, including plaintiff's Physical Profile Serial Report, AF Form 422, dated May 22, 2000, in which Dr. Abbott misdiagnosed Dr. Childers with Marfan Hypermobility Syndrome with osteoporosis and a dilated aortic root, determined that her medical condition required MEB or PEB processing and, temporarily changed her rating to P–4–T, and her Aeromedical Evacuation Patient Record, dated June 12, 2000, which noted the EDS diagnosis from Dr. Dietz and her medical problems on the flight back to Ramstein Air Base.

In addition to the plaintiff's medical records and information presented by Dr. Childers, the AFBCMR considered the four additional inputs, three of which contained appraisals regarding Dr. Childers' MEB requests.[20] The AFBCMR, "May get additional information and advisory opinions on an application from any Air Force organization or official."[21] 32 C.F.R. § 865.4(a)(1) (July 1, 1999). The AFBCMR cited these recommendations in the report it issued.

The first opinion/recommendation submitted by a medical consultant, Colonel Frederick W. Hornick, M.D., Chief Medical Consultant for the AFBCMR and Medical Advisor to the Air Force Personnel Council, includes fact, discussion, and recommendation sections in which he addressed Dr. Childers' MEB request based on her EDS and ADHD. Dr. Hornick noted Dr. Childers' EDS and ADHD diagnoses, the referral for an MEB, and her training reports that indicated high satisfaction with her performance. According to Dr. Hornick:

> During her years of service, she was found to have a congenital abnormality of her connective tissue called Ehler[s]–Danlos Syndrome (EDS), and she was diagnosed with Attention Deficit–Hyperactivity Disorder (ADHD) while still in her residency program but *following her commissioning.* As the diagnosis was not established until after she was commissioned, it was not disqualifying for continued service as opposed to standards of appointment, enlisted or induction (AFI 48–123, Attachment 2 *vice* Attachment 3) Records indicate that neither of these, or associated conditions, were subject to disability consideration, and a contemplated MEB following diagnosis of the EDS was not convened. In any event, she had been capable of completing some 13 years of higher education prior to her first duty assignment, thus proving her ability to function well in stressful environments. Her training reports indicate high satisfaction with her performance and anticipated contribution to the military.

(emphasis in original).

Dr. Hornick concluded that Dr. Childers' medical conditions did not render her unfit to perform her duties. Specifically, he thought that EDS was not a cause for a finding of unfitness and that her EDS was genetic:

> [Dr. Childers'] recognized medical and psychological disorders were not unfitting for performance of her military duties once

---

**20.** The fourth consultant, who submitted information to the AFBCMR, Major Robinson, Chief, Professional Staff Actions, only addressed Dr. Childers' request to expunge her records of the suspension restriction, not Dr. Childers' MEB request.

**21.** This regulation, 32 C.F.R. § 865.4(a)(1), was operative on June 30, 2000 when Dr. Childers was discharged from the Air Force. The provision is unchanged through the latest rules. *See* 32 C.F.R. § 865.4(a)(1) (July 1, 2007).

she was already commissioned. Appropriate evaluations and treatments were initiated for the established diagnoses. The EDS is not cause for a finding of unfitness and clearly was a part of the applicant's genetic makeup that she brought with her to the military. As she has no unfitting conditions upon which to base disability processing, she was appropriately not evaluated in that system, and approval of her present request for such disability consideration is not warranted or recommended.

Dr. Hornick recommended denying Dr. Childers' request for an MEB. He deferred a finding on her request for expungement of references to the credentialing action to the proper legal authority.

The AFBCMR also considered a second recommendation from Mr. Norman Saucier, Air Force Personnel Center's Air Force Physical Disability Division. In a format similar to Dr. Hornick's, Mr. Saucier included fact, discussion, and recommendation sections addressing Dr. Childers' MEB request. In the discussion section, Mr. Saucier began with a general description of the disability evaluation system and followed with specific information from Dr. Childers' case. He addressed the referral for an MEB, as well as information from her military records indicating Dr. Childers was able to perform her military duties to the date of her discharge. Mr. Saucier wrote:

> Individual's military records reflect the applicant was identified for a medical examination on 9 May 00 due to her pending voluntary separation. Although some previous mention was made in her medical records that she was going to undergo an MEB, a review of the medical data from her 14 Jun 00[22] appointment does not point to any severe or grave medical conditions which would have required that she be presented before an MEB. Comments in her medical records (one day prior to her discharge) by her provider states: "It is agreed that her current diagnoses do not warrant a medical board and that she would be able to continue her duties in her

current medical condition, although with a limited profile. Although her condition could progress to requiring a[sic] MEB, there is not current indication and no way to predict a future need. Therefore, I will not initiate a medical board." Her military records clearly reflect that she was able to perform her military duties right up until her discharge date. This is also verified in her last performance report in which she received laudatory comments concerning her duty performance and received the highest ratings attainable.

Mr. Saucier also stated, "Although some of her medical conditions may have been onset prior to her discharge, they were not severe enough to prematurely curtail her military career." The discussion section concluded: "A thorough review of the AFBCMR case file revealed no errors or irregularities that would justify that she undergo an MEB/PEB. The medical aspects of this case are fully explained by the Medical Consultant [Dr. Hornick]; we agree with his advisory." Mr. Saucier recommended denying Dr. Childers' MEB/PEB request and found that, "The member has not submitted any material or documentation to show she was unfit due to a physical disability under the provisions of Chapter 61, Title 10, USC, at the time of her voluntary discharge."

The AFBCMR forwarded Dr. Hornick's and Mr. Saucier's memoranda to Dr. Childers with a letter informing Dr. Childers that she could provide comments to the memoranda. Dr. Childers submitted a brief to the AFBCMR in response to the memoranda, which the AFBCMR referred to in its opinion. The section referring to the MEB request in Dr. Childers' responsive brief did not include information on the merits of how Dr. Childers was unable to perform her duties due to her medical conditions. Instead, Dr. Childers concentrated her argument on her out-processing appointment with Dr. Reynolds, which she called a "sham." She alleged that Dr. Reynolds had failed to physically examine her, tore up her previous medical profile from Dr. Abbott, and substi-

---

22. As noted above, although Mr. Saucier refers to an appointment on June 14, 2000, both parties suggest that Mr. Saucier is referring to the appointment Dr. Childers had with Dr. Reynolds on June 13, 2000.

tuted a revised statement without reading the report from Johns Hopkins Hospital. Dr. Childers argued that either Dr. Reynolds had been influenced by his command or "he was complicit in the commander's preconceived strategy for hustling Dr. Childers out as quickly and with as few benefits as possible." Dr. Childers disputed the statement that her military records reflect that she was able to do her job until her discharge date. According to Dr. Childers, she was not performing her duties as a psychiatrist after her privileges were suspended in October 1999, and she did not receive an OPR covering the one-year period that ended with her separation. There is, however, no suggestion in her papers that she was not fit to perform her duties as a psychiatrist in the military. In fact, during that one-year period, she was pursuing remedies to be fully reinstated, to be allowed to resume all clinical privileges, and, according to her own statement had orally requested to remain in the military. In addition, shortly after her separation from the Air Force, she applied for a civilian job as a child psychiatrist in Salem, Oregon.

Regarding Dr. Hornick's and Mr. Saucier's memoranda, Dr. Childers argued that Mr. Saucier relied on Dr. Hornick's opinion, which she maintained was flawed because Dr. Hornick did not "address with particularity a variety of the symptoms and conditions that Dr. Childers had identified," and as to her Ehler[s]-Danlos Syndrome (EDS) she alleged his comments were entirely conclusory. Dr. Childers also stated that Dr. Hornick "swept under the rug" her EDS because the condition was genetic and incorrectly suggested that the condition was identified in her residency. Dr. Childers clarified that her EDS was diagnosed in the spring of 2000, her osteoporosis was diagnosed while on active duty, and her ADHD was diagnosed during her fellowship in 1997.

Dr. Childers concluded the section pertaining to her MEB request by trying to tie the credentialing action in with her MEB denial:

The good news is that the Air Force has already decided that Dr. Childers was a victim of unfairness at their command in connection with her credentials. To pretend that that unfairness played no role in this other key part of her outprocessing, however, is utterly unrealistic. She was treated like a criminal—followed around by an enlisted may as if she might flee or commit some offence or indiscretion. This was far from the finest hour of Air Force Medicine, and the fact that all of this was done to her—a medical officer herself—makes it all the more startling. There is no way the AFBCMR can have confidence in a process conducted under these circumstances. To ensure that this officer gets what she deserves, an MEB should be ordered, preferably at a non-Air Force facility, in order to avoid any cloud on the results.

Following submission of Dr. Childers' response to Dr. Hornick and Mr. Saucier, the AFBCMR also considered a memorandum from the Air Force's legal consultant, Mr. Harlan Wilder, Legal Advisor, Chief, General Law Division, HQ USAF/JAG. Mr. Wilder mainly commented on Dr. Childers' request to clear her records of all references to the credentialing action and Dr. Childers' request for her records to be corrected to show that she remained on active duty for an additional year. His only mention of Dr. Childers' MEB request was in the last paragraph of his memorandum:

We also recommend that applicant's request for an MEB/PEB be denied. Both the AFBCMR Medical Consultant and Air Force Physical Disability Section disagree with applicant's contention that she should have been offered an MEB/PEB prior to her separation. We have reviewed their opinions and concur with their conclusions that applicant's recognized medical and psychological disorders were not unfitting for performance of her military duties and therefore she was appropriately not evaluated in the disability system prior to her separation.

The AFBCMR also forwarded Mr. Wilder's memorandum to Dr. Childers and informed Dr. Childers that she could offer comment. Dr. Childers responded as follows:

As for whether the command's effort to exclude Dr. Childers from the MEB/PEB process was fair or proper, the advisory

opinion adds nothing, but simply expresses agreement with views previously submitted by the Physical Disability Division and the Medical Consultant, to which we responded on April 8, 2002. As explained on page 4 of that response, the prior advisory opinions made no effort to address with particularity a variety of the symptoms and conditions that Dr. Childers identified. As to her Ehlers–Danlos Syndrome, the Medical Consultant's memorandum opinion is entirely conclusory. Additionally, the environment in which Dr. Childers' commend-influenced non-examination took place inspires no confidence. She should be examined properly, and afforded the fair shake *any* departing member of the United States Air Force is entitled to. That hasn't happened yet.

(emphasis in original).

In this court, Dr. Childers contends that she should have been provided with an MEB to review her disability status based on her ADHD, osteoporosis, and EDS diagnoses. Addressing each of these medical conditions in turn, the government acknowledges that Dr. Childers suffered from ADHD, but argues that, under relevant regulations, Dr. Childers' ADHD was not an unfitting, ratable disability unless Dr. Childers also suffered from a related, causative disorder that is ratable and that constitutes a basis for determining that she was unfit. The instructions, DODI 1332.38, ¶¶ E5.1.2.1 and E5.1.3.4, together indicate that certain conditions, such as ADHD, "do not constitute a physical disability and are not ratable in the absence of an underlying ratable causative disorder." DODI 1332.38, ¶ E5.1.3.4 (listing ADHD as a condition covered by DODI 1332.38, ¶ E5.1.2.1.).

The government argues that, since Dr. Childers did not even allege that she suffered from an underlying causative ratable disorder and there is no such medical documentation in the record, Dr. Childers' ADHD cannot be used as a basis for determinating that she was unfit to perform her military duties as a psychiatrist. In response to the government's argument, plaintiff ultimately appears to agree that ADHD is not a ratable disorder without an underlying causative factor. Initially, Dr. Childers cites her Physical Profile Serial Report, signed by Dr. Abbott, to argue that "Dr. Childers suffered from 'underlying conditions' that required disability processing." In the Physical Profile Serial Report, Dr. Abbott incorrectly diagnosed Dr. Childers with Marfan Hypermobility Syndrome with osteoporosis and dilated aortic root. However, the report signed by Dr. Abbott does not include any notation of ADHD and does not indicate that Dr. Abbott considered Dr. Childers' Marfan Hypermobility Syndrome condition "ratable" or that it could operate as "an underlying ratable causative disorder," as required by DODI 1332.38, ¶ E5.1.2.1.

Dr. Childers also included in the administrative record in this court her January 2002 disability rating from the Department of Veterans Affairs. The DVA rated Dr. Childers 50% disabled based solely on her ADHD, but rejected a claim for gastroesophageal disorder and found that Dr. Childers' claimed ailments, including EDS and osteoporosis, were not ratable at that time.

Eventually, Dr. Childers admitted in her brief to this court that her DVA rating does not help the court determine her military disability retirement eligibility, as follows:

Dr. Childers' 50% rating was based on her ADHD, AR 167, a condition which the Secretary of Defense has designated as a defect of a developmental nature that "does not constitute a physical disability and [is] not ratable in the absence of an underlying ratable causative disorder." DODI 1332.38, ¶¶ E5.1.2.1, E5.1.3.4. Since her ADHD was not rated by the DVA in relation to a causative disorder, her DVA disability rating has no bearing on the Court's determination of her eligibility for military disability retirement.

Both the DVA and all the military service branches, including the Air Force, use the Veterans Administration Schedule for Rating Disabilities (VASRD). *See* DODI 1332.18, ¶ 3.8. The VASRD, however, is used in different ways. The military uses it "to determine fitness for performing the duties of office, grade, and rank, whereas the VA [Veterans Administration] uses the VASRD to determine the disability ratings based on an

evaluation of the individual's capacity to function and perform tasks in the civilian world." *Haskins v. United States*, 51 Fed.Cl. 818, 826 (2002). Although a VA rating decision may be relevant to consideration of an appropriate disability rating, it is not binding on the service branch. *See Bennett v. United States*, 200 Ct.Cl. 635, 643–44 (1973); *see also Unterberg v. United States*, 188 Ct.Cl. 994, 1003, 412 F.2d 1341, 1346 (1969); *Williams v. United States*, 186 Ct.Cl. 611, 614, 405 F.2d 890, 891–92, *cert. denied*, 396 U.S. 966, 90 S.Ct. 447, 24 L.Ed.2d 432 (1969), *reh'g denied*, 396 U.S. 1047, 90 S.Ct. 692, 24 L.Ed.2d 694 (1970). The VA's decision is considered along with the other evidence presented by the plaintiff for the court's consideration. *Bennett v. United States*, 200 Ct.Cl. at 644 (citing *Wesolowski v. United States*, 174 Ct. Cl. 682, 693 (1966)).

Dr. Childers did not present any information, other than her Physical Profile Serial Report and her DVA rating, in the administrative record submitted to the AFBCMR and to this court, to indicate she suffered from a ratable disorder that caused her ADHD, as required by DODI 1332.38, ¶ E5.1.2.1. This court, therefore, concludes that Dr. Childers has not demonstrated that the AFBCMR's decision was arbitrary or capricious or that the AFBCMR ignored or unreasonably construed the evidence when it rejected her claim to an MEB on the basis of her ADHD.

Dr. Childers also bases her MEB and disability request on her diagnosis of osteoporosis, which she claims was a medical condition requiring an MEB. In the administrative record before the AFBCMR and this court, Dr. Childers presented her Radiologic Examination Report. According to the Radiologic Examination Report, Dr. Childers was examined on February 15, 2000 and classified as osteoporotic based on her T-score. Dr. Childers' Physical Profile Serial Report and Aeromedical Evacuation Patient Record, also part of the administrative record, repeat the same diagnoses.

As noted above, according to DODI 1332.38, ¶ E2.1.25, "[a] medical impairment or physical defect standing alone does not constitute a physical disability." The mere fact that Dr. Childers was diagnosed with osteoporosis does not constitute a finding that she had a physical disability which rendered her unfit to serve as a child and adolescent psychiatrist in the Air Force and which required disability processing. Dr. Childers has the burden to present evidence that the AFBCMR ignored relevant information demonstrating that her osteoporosis rendered her unfit to perform her duties as a child and adolescent psychiatrist. Although the three reports, the Radiologic Examination Report, the Physical Profile Serial Report, and the Aeromedical Evacuation Patient Record are evidence of Dr. Childers' osteoporosis, none of the reports contain information regarding how Dr. Childers' osteoporosis impaired her ability to perform her military duties as a child and adolescent psychiatrist or rendered her disabled for retirement purposes. There appear to be very limited references in the administrative record addressing specific symptoms Dr. Childers may have experienced due to her osteoporosis, some allegations by Dr. Childers, and none from a treating or examining physician. In an e-mail dated June 22, 2000, Dr. Childers wrote to Dr. Reynolds, her Health Care Provider:

> Ehlers–Danlos Syndrome contributes to dysgraphia. Pain from Ehlers–Danlos and osteoporosis affect my mood. Regurgitation and jaw pain (Ehlers–Danlos) compromise nutrition. In the preceding 12 months I was absent many mornings and sometimes full days due to these symptoms, which had an adverse effect on my evaluation.

Even Dr. Childers' own statement is vague and does not indicate any frequency or severity of her pain, or, how much of any symptomology was associated with her osteoporosis. Therefore, Dr. Childers has not met her burden to demonstrate that the AFBCMR acted arbitrarily, capriciously and in bad faith when it determined that there was insufficient evidence to support the existence of error or injustice regarding Dr. Childers' request for an MEB based on osteoporosis.

In addition to Dr. Childers' ADHD and osteoporosis, Dr. Childers claims that she was entitled to disability processing due to

her EDS. In support, Dr. Childers presented her Physical Profile Serial Report, AF Form 422, signed by Dr. Abbott, as evidence of her entitlement to MEB processing and disability retirement. In this report, dated May 22, 2000, Dr. Abbott misdiagnosed Dr. Childers with Marfan Hypermobility Syndrome with osteoporosis and dilated aortic root disease. Dr. Dietz subsequently determined that the plaintiff presented signs of EDS. Dr. Abbott placed an "X" next to the box titled "MEDICAL DEFECT/CONDITION REQUIRED MEB OR PEB PROCESSING. ASSIGNMENT AVAILABILITY CODE (AAC) 37 APPLIES." [23] In this report, the "REVISED TEMPORARY," not the "REVISED PERMANENT" fill-in boxes on the report were marked. Dr. Abbott revised Dr. Childers' previous Physical (P) profile of P–3–W [24] to P–4–T, on a scale in which "4" stands for an organic defect(s), systemic and infectious disease(s), all conditions disqualifying … for World Wide Service, while "T" indicates that "a member is temporarily not qualified for retention or is undergoing an MEB to determine fitness." [25] AFI 48–123, vol. 2, ¶ 4.5.6.4.2.

When Dr. Abbott changed plaintiff's profile to P–4–T, he misdiagnosed Dr. Childers with Marfan Hypermobility Syndrome with osteoporosis and dilated aortic root. Only the osteoporosis turned out to be correctly diagnosed. Even based on Marfan Hypermobility Syndrome, Dr. Abbott did not elaborate in Dr. Childers' Physical Profile Serial

Report any symptoms associated with the Marfan Hypermobility Syndrome condition or how the diagnosis could interfere with plaintiff's ability to perform as a psychiatrist in the military. Moreover, in an e-mail to Dr. Reynolds asking him to provide her with a "new permanent profile" before her separation from the Air Force, Dr. Childers confirms that even she understood that Dr. Abbott's physical profile of P–4–T on the serial report was a temporary designation.

In addition to the markings in the box for MEB or PEB processing on Dr. Abbott's report, Dr. Childers also cites to AFI 41–210, ¶ 10.3.1, which is quoted above, to argue that the change in her profile and the referral for an MEB required an MEB in her case within 30 days. The government responds that AFI 41–210, ¶ 10.3.1 provides instructions to Medical Corps officers, but does not confer on service members the right to an MEB in any particular circumstance. This section gives medical personnel the responsibility to identify service members who do not appear to qualify for worldwide service and instructs those officers to refer service members for an MEB within 30 days, after the Medical Corps officers have made a definitive diagnosis. This instruction section does not address end-of-service medical issues.

In her brief to this court, Dr. Childers concludes that Dr. Abbott "made a definitive diagnosis of her conditions as evidenced by the MEB block that he marked on her physi-

23. Code 37 indicates a profile for members undergoing Medical Evaluation Boards (MEB) who will be "monitored monthly until a disposition is obtained." *See* AFI 48–123, vol. 2, ¶ 4.4.2.2. (June 5, 2006). In the plaintiff's case, the Physical Profile Serial Report was filled out on May 22, 2000, and she separated from the military on June 30, 2000.

24. "P–3" indicates a "[s]ignificant defect(s) or disease(s) under good control. Capable of all basic work commensurate with grade and position but that may affect worldwide deployability. Deployment or PCS [permanent change of station] to remote location requires clearance by medical provider." AFI 48–123, vol. 4, att. 4. The "W" indicates that a member is qualified for retention in the Air Force. AFI 48–123, vol. 2, ¶ 4.5.6.4.2.

25. The Air Force expands on the use of the "T" suffix:

4.5.6.4.2.1. The "T" suffix may only be used in conjunction with a "4" profile in any of the PULHES [Physical condition, Upper extremities, Lower extremities, Hearing, Vision, Psychiatric] categories.
4.5.6.4.2.2. A "T" suffix is *not permanent* and may not be imposed for more than 12 months without MEB/PEB action. Medical conditions requiring a profile are cumulative in nature (excluding conditions that are unrelated). Even when profile periods are intermittent, the sum of all profile time periods for the condition are totaled to determine the cumulative days.
4.5.6.4.2.3. A "T" suffix precludes deployment.
4.5.6.4.2.4. A "T" suffix precludes overseas PCS [permanent change of station] assignment until the condition is resolved, or member is returned to duty following MEB/PEB.
AFI 48–123, vol. 2, ch. 4 (emphasis added).

cal profile." The record indicates, however, that Dr. Abbott did not make a definitive diagnosis, but, in fact, made an incorrect diagnosis of Marfan Hypermobility Syndrome, as opposed to EDS.[26] In addition, Dr. Abbott placed Dr. Childers' P–4–T profile in the "REVISED TEMPORARY" section of the Physical Profile Serial Report, rather than in the "REVISED PERMANENT" section, also available to him on the form he signed.

On June 13, 2000, following Dr. Abbott's May 22, 2000 MEB recommendation, Dr. Childers had an out-processing appointment with Dr. Reynolds. Her tour of duty was due to be completed shortly, upon the expiration of her active duty commitment (ADSC).[27] Prior to plaintiff's appointment with Dr. Reynolds, in the Aeromedical Evacuation Patient Record, Dr. Dietz had included plaintiff's diagnosis to indicate that Dr. Childers showed signs of EDS, not Marfan Hypermobility Syndrome, as previously diagnosed by Dr. Abbot. Dr. Dietz wrote his EDS diagnosis in Dr. Childers' Aeromedical Evacuation Patient Record and in an unsigned letter stamped "DRAFT" which was faxed to Dr. Childers' military counsel.

Dr. Dietz presented similar information in his draft letter provided by facsimile copy to the Air Force. He explained that Dr. Childers' condition warranted an EDS diagnosis and that, while individuals with different variants of EDS were at risk for enlargement and tear of the aorta, Dr. Childers' aorta was not enlarged at the time of his examination, although it had "an abnormal contour caused by failure of tapering of the beginning segment that is characteristic of individuals with EDS that will go on to have aortic enlargement." Based on that information, Dr. Dietz recommended frequent follow-ups, including echocardiograms and certain exercise restrictions. As a precautionary matter, he suggested Dr. Childers should avoid contact sports, competitive sports, and isometric activities that involved muscle straining. However, he encouraged her "to remain active with low intensity aerobic activities."

In neither Dr. Dietz's entries on the Aeromedical Evacuation Patient Record nor in his draft letter, did Dr. Dietz present information suggesting any impact on plaintiff's performance as a child and adolescent psychiatrist or suggest any restriction of such duties. Although Dr. Dietz recommended avoiding certain types of physical exercise, there is no suggestion that she was not fit to continue her military duties as a child and adolescent psychiatrist. As such, the information presented by Dr. Childers regarding her EDS is insufficient to establish plaintiff's right to an MEB. At the time Dr. Reynold's declined to initiate an MEB for Dr. Childers during Dr. Childers during out-processing, the plaintiff's records did not contain indications that plaintiff's EDS or physical symptoms rendered her unfit to continue her military duties as a child psychiatrist.

Dr. Childers also relies on AFI 41–210, ¶ 10.1.4.6 and AFI 48–123, vol. 2, ¶¶ 4.4.4.5 and 4.4.4.5.1 to argue that the Air Force failed to follow its own regulations when Dr. Reynolds, her Health Care Provider, denied her an MEB. According to ¶¶ 4.4.4.5 and 4.4.4.5.1, a Profile Officer performs final review and signs all AF Forms 422 recommending an MEB.[28] AFI 41–210, ¶ 10.1.4.6

26. In a footnote in her brief in this court, Dr. Childers attempts to argue to the court that Marfan Hypermobility Syndrome and EDS are "similar disorders," although no medical support was offered. Plaintiff proposes that "Dr. Abbott was on the right track with his diagnosis." Plaintiff's footnote, however, suggests that even plaintiff recognized that Dr. Abbott's diagnosis was not "definitive" when she wrote, "the complexity of Dr. Childers' condition required a June 2000 referral to Johns Hopkins in order to pin down a diagnosis of EDS."

27. Mr. Fidell, on Dr. Childers' behalf, argues that it would have been futile for Dr. Childers to have requested to withdraw her AF Form 780, Officer Separation Action, apparently submitted at least six months prior to her separation date, due to her relationships with Air Force personnel and the statements she alleges were made to her that such a request would not have been granted. Nevertheless, the fact remains that no such request was made and, other than Dr. Childers' allegations, the record before the court does not support her assertions of futility.

28. The purpose of Chapter 4 of AFI 48–123, vol. 2, titled Profiles and Duty Limitations, which contains ¶¶ 4.4.4.5 and 4.4.4.5.1, is stated as follows:

4.1. **Purpose.** This chapter, with AFI 48–123V4, Attachment 3 and AFI 48–123V4, At-

states, "Officers assigned to the MTF [Military Treatment Facility] staff will not receive an MEB or processing at their own medical facility." Dr. Childers argues to the court that, since Dr. Childers and Dr. Reynolds were members of the same MTF, Dr. Reynolds had a conflict of interest and "lacked authority to cancel her MEB processing." According to the plaintiff, once Dr. Abbott, the Profile Officer, executed the Physical Profile Serial Report, the disability processing was "commenced" and Dr. Reynolds did not have to sign the report.

The government argues that Dr. Reynolds, as Dr. Childers' Health Care Provider, should have signed the Physical Profile Serial Report Form in addition to Dr. Abbott, "as is evident from the face of the form." According to the government, the absence of his signature on the profile form signified that Dr. Reynolds had determined that an MEB was not warranted, and that no MEB proceeding had began. Regardless, Air Force Instruction, paragraph 10.1.4.6 does not assist the plaintiff. Paragraph 10.1.4.6 addresses the location where an MEB should or should not be "conducted" and does not suggest that an MEB begins when the Physical Profile Serial Report is signed, with or without the requisite signatures.

The record before the court is replete with other tangential material, by which plaintiff seeks to establish her entitlement to an MEB and retirement disability benefits. Dr. Childers includes an e-mail she wrote to Dr. Reynolds on June 22, 2000, the subject line of which was "Sudden Death and Cardiovascular Concerns." Dr. Childers copied Congressman Wu of Oregon, her attorneys Captain Milam and Mr. Fidell, and Major McDonnell. Dr. Childers began her e-mail by recounting that Dr. Childers' aunt, who complained of similar choking sensations and difficulties swallowing, died of a cerebral hemorrhage at Dr. Childers' age and her uncle died at the age of 54 of a "previously-

repaired abdominal aortic aneurysm." Dr. Childers suggested that her cardiac condition was congenital and not "pre-existing," since she had just become aware of her EDS.

Then, Dr. Childers continued:

AFI 48–123 addresses even *congenital* cardiac conditions (see reference below). Furthermore, I understand the concept of 'pre-existence' is a moot point after 8 years of military service. I reached my 8 year point on 13 June 00.

I realize you do not determine whether a condition is preexisting or not, that is the job of the MEB. I mention this because it may be of interest to you and other recipients of this communication.

Please note the supporting documentation that follows:

Per AFI 48–123:

A2.7.1.21. Congenital anomalies. Coarctation of aorta, atrial or ventricular septal defect and other *congenital anomalies* unless satisfactorily treated by surgical correction. [I expressed concern about a forceful heartbeat, occasional sensation of 'skipped' beats and shortness of breath. I gives [sic] a history of 'grey outs' consistent with vasomotor instability and syncope.

Plaintiff then referred to Dr. Dietz's letter in which Dr. Dietz indicated Dr. Childers' aorta had an abnormal contour. Dr. Childers included the following:

A2.13.2.4.2. Pes planus, symptomatic, more than moderate with pronation on weight bearing which prevents the wearing of a military shoe, or when associated with trophic changes. [I can wear a military shoe with customized arch supports. My podiatrist considers my pes planus to be 'severe'. It is a feature consistent with Ehlers–Danlos Syndrome.]

A2.14.1. Congenital anomalies presenting functional impairment of a degree to preclude the satisfactory performance of duty.

---

tachment 4, establishes procedures for the documentation and administrative management of members with duty limitations and occupational restrictions. These procedures have been developed to ensure maximum utilization and readiness of personnel, while preserving their health and preventing further injury or

illness. When individuals have medical conditions affecting their continued qualification for retention in the Air Force, as outlined by the standards in Attachment 2, this chapter also describes appropriate courses of action for medical board disposition.

[I complained of chronic back pain, especially sacroiliac, thoracic and neck, with limited range of motion in my right hip in October of 1999. I inadvertently re-injured myself while asleep. Injuries occur without significant trauma or x-ray findings. I complains [sic] of spontaneous 'tennis elbow' and arthritic-feeling hands that interfere with typing, a significant aspect of m[. . . .] These phenomena are also consistent with Ehlers–Danlos Syndrome.]

A2.20.1. The individual is precluded from a reasonable fulfillment of the purpose of his or her employment in the military service. [In our discussion, Dr. Reynolds, you mentioned I am not deployable. That precludes me from reasonable fulfillment of the purpose of my employment in the military service.]

A2.20.5. The individual requires an indefinite (permanent) excusal from fitness testing. [My physical limitations permanently preclude vigorous bicycling, required by the Air Force for physical testing. My heart condition indicates a permanent profile restricting me from this activity.]

A2.20.13. The individual has coexisting medical defects that are thought to be the primary cause of unacceptable behavior or unsatisfactory performance. [Ehlers–Danlos Syndrome contributes to dysgraphia. Pain from Ehlers–Danlos and osteoporosis affect my mood. Regurgitation and jaw pain (Ehlers–Danlos) compromise nutrition. In the preceding 12 months I was absent many mornings and sometimes full days due to these symptoms, which had an adverse effect on my evaluations.]

In summary, I am recently diagnosed with serious, permanent conditions qualifying me for a military Medical Evaluation Board. In light of this updated information, I hope you will do the right thing and provide me a new permanent profile on an AF Form 422 that indicates I am not worldwide qualified before I separate from the Air Force on 30 June 00. Prior to that date I am pleased retrieve [sic] the updated AF Form 422 at your convenience.

(reproduced as submitted by Dr. Childers).

The government's response to plaintiff's stream of consciousness narrative was that despite Dr. Childers' allegations, the administrative record does not contain a description of physical symptoms, corroborating diagnoses, or medical information to determine the severity or frequency of the symptoms Dr. Childers describes in her e-mail or how these symptoms specifically affected or prevented Dr. Childers from performing her duties as a child and adolescent psychiatrist. Moreover, the government pointed out that Dr. Childers' statement in her e-mail to Dr. Reynolds, that her aortic defect "severely limits [her] physical activities," was contradicted by Dr. Dietz's encouragement to Dr. Childers to "remain active, with low intensity aerobic activities" without any suggestion by Dr. Dietz of restrictions on her military responsibilities as a child and adolescent psychiatrist.

Dr. Childers further tries to rely on medical difficulties she appears to have experienced on her flight back from her examination with Dr. Dietz at Johns Hopkins Hospital to Ramstein Air Base in Germany, including right-sided chest pain. Although Dr. Childers recounts her own version of what occurred, the portion of the Aeromedical Evacuation Patient Record which deals with her return flight to Germany has illegible segments.[29] From this document, it is difficult for the court to determine the extent of what in fact occurred on the return flight. What is legible is that she suffered some chest pain. Nowhere in the record before the court, however, are these difficulties or symptoms related to her ADHD, EDS, or osteoporosis diagnoses, nor is there an indication as to how her difficulties on the flight may have affected Dr. Childers' ability to perform her military duties as a child and adolescent psychiatrist upon her return to Germany.

Dr. Childers' submissions often focus on an alleged hostile work environment Dr. Childers claims she faced in Germany, which Dr.

---

29. Other portions of the Aeromedical Evacuation Patient Record, which are legible, include the portion which contains Dr. Dietz's evaluation and diagnosis.

Childers argues led to the Air Force's refusal to grant her MEB processing. In conclusory remarks in her brief to this court, Dr. Childers tries to tie the credentialing action to her denial of MEB and disability processing. She argues that, "Her command's desire to have her out of the Air Force, an effort that included threatening her ability to practice as a clinician, lay at the heart of that refusal," and, "[a]s the AFBCMR found, the command had no justifiable reason for the credentialing action. There was likewise no valid reason to deny her an MEB." Dr. Childers alleges that the command had a "vendetta" against her, including ensuring that she would never receive an MEB. Dr. Childers states that her out-processing appointment was arranged by Colonel DuChamp and performed by Dr. Reynolds, who "did not physically examine her, contrary to the regulation." According to Dr. Childers, Dr. Reynolds ignored her diagnosis from Johns Hopkins and "mocked her" when she told him about having discovered the cause of her swallowing complications. Dr. Childers alleges that Dr. Reynolds had already decided to deny her an MEB before her out-processing appointment, and that he tore up her profile on which the box for an MEB was marked, and gave her another, previously prepared one, that denied an MEB. Dr. Childers describes herself as *"persona non grata"* (emphasis in original), and that "[h]er commander saw to it that she did not receive an MEB prior to separation. The command disliked her and wanted her out of the Air Force as soon as possible," and the MEB would be an "inconvenient obstacle to getting rid of Dr. Childers." Finally, Dr. Childers offers that "her command was determined to separate her without delay," and "her MEB was unlawfully cancelled."

Although she makes many allegations, Dr. Childers had the evidentiary burden first to the AFBCMR, and now to this court, to support her claim that she was entitled to an MEB and to demonstrate her alleged lack of fitness to perform her duties due to medical reasons, when she left the service. *See* 32 C.F.R. § 865.4(a) ("The applicant has the burden of providing sufficient evidence of probable material error or injustice.") Although before the AFBCMR Dr. Childers concentrated on presenting evidence regarding her credentialing action, Dr. Childers also addressed her fitness for duty and MEB request. Moreover, plaintiff's medical records were in the record before the AFBCMR and were considered by that Board. Furthermore, shortly after she left the military, she sought work as a psychiatrist in the civilian sector, as evidenced by the request for a reference from the Salem Oregon Hospital. In sum, Dr. Childers has failed to present information on how her ADHD, osteoporosis and/or EDS prevented her from performing her duties as a child and adolescent psychiatrist. Dr. Childers primarily based her MEB request to the AFBCMR and to this court on her Physical Profile Serial Report, on which referral for an MEB had been marked, on which the temporary diagnosis turned out to be incorrect. Dr. Childers has not met her burden to show that the AFBCMR's determination to deny her an MEB or disability retirement status was arbitrary, capricious, an abuse of discretion, or contrary to law.

The record reflects that the Air Force and the AFBCMR had sufficient basis to conclude that Dr. Childers' conditions did not demonstrate she was unfit for her duties as a child and adolescent psychiatrist at the time her service commitment ended, and had a reasonable basis for not authorizing an MEB.

## CONCLUSION

Based on the record before this court, the AFBCMR did not commit error and did not act arbitrarily, capriciously or notwithstanding the law, when it denied Dr. Childers' request for a Medical Evaluation Board. For the foregoing reasons, this court **GRANTS** defendant's motion for judgment upon the administrative record. The Clerk of Court shall **DISMISS** plaintiff's complaint and enter **JUDGMENT** for the defendant.

**IT IS SO ORDERED.**